WEST *v.* FIDELITY-BALTIMORE NATIONAL
BANK ET AL., EXECUTORS

[No. 156, September Term, 1958.]

*Decided January 26, 1959.*

*Motion for rehearing filed February 24, 1959, denied March 13, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*William G. Boyce, Jr.,* with whom were *Musgrove, Preston & Boyce* and *James B. Murphy* on the brief, for appellant.

*Benjamin C. Howard,* with whom were *Robert L. Karwacki* and *Miles & Stockbridge* on the brief for appellees, Fidelity-Baltimore National Bank and Oliver S. Mullikin, Executors.

*H. Vernon Eney,* with whom were *David C. Green* and *Venable, Baetjer & Howard* on the brief for appellees, St. John's College, Goucher College, The Committee of the Presbyterian Church in the City of Baltimore, The Johns Hopkins Hospital and The Johns Hopkins University.

HORNEY, J., delivered the opinion of the Court.

Addison E. Mullikin (the testator) and Muriel Kemp West (the caveator) were first cousins. At his death in 1956 the testator left an estate of over $7,000,000. The greater part of the estate was bequeathed to charity. When

the caveator found he had bequeathed her only about $48,000 she filed a caveat to his will. At the close of the evidence offered by the caveator in the lower court, the trial judge found there was not sufficient evidence to invalidate the will and directed the jury to answer the several issues so as to sustain it. The caveator appealed, contending that the trial court erred in certain of its rulings concerning the admissibility of evidence, and in its refusal to submit the issues to the jury.

The testator was born September 26, 1874, in Trappe, Talbot County, Maryland. He graduated from St. John's College, taught school while studying law at the University of Maryland Law School, and became prominent in law, business affairs and civic and political matters. The testator, who never married, had no relatives closer than first cousins. Approximately twenty-five years before his death the testator took, as a legal fee, 60,000 shares of the then almost valueless common stock of the Pennsylvania Glass Sand Corporation (company or glass sand company). He continued to be active until his death in the company's management in association with Abraham J. Fink, a life long friend and business associate, and others. Through the years the company prospered and the value of the stock steadily increased until the 112,000 shares he owned when he died were appraised at $6,800,000.

The contested will executed October 19, 1956, bequeathed pecuniary and specific legacies to one colored and two white Protestant churches in Trappe, to the Protestant Episcopal Bishop of Maryland, to the Roman Catholic Archbishop of Baltimore, and to other charities, as well as pecuniary and specific legacies to over fifty persons—relatives, godchildren, close personal friends, employees and professional and business associates. Most of the legacies consisted of shares of stock in the glass sand company. One-fourth of the rest, residue and remainder—consisting principally of shares in the glass sand company—was bequeathed to St. John's College, one-sixteenth to Goucher College, and one-sixteenth to the First Presbyterian Church of Baltimore, where he had taught a Bible class. Of the remaining five-eighths of the rest and

residue, $100,000 was bequeathed to the Episcopal Church of Our Saviour on Broadway "for the patients at the Johns Hopkins Hospital," and the remainder was divided equally between the University of Maryland (School of Medicine), the Johns Hopkins University (School of Medicine) and fourteen hospitals—thirteen in Baltimore and one in Easton —in trust for a period of ten years.

The testator had made four prior wills in 1952, in 1953, in 1954 and on February 3, 1956. The general testamentary plan was much the same in each. In 1952 the relatives received one-fourth of the rest and residue and the close friend and business associate (Abraham J. Fink) and one of the testator's law partners received one-eighth each. In 1953 the relatives were bequeathed one-third. In 1954 the testator engaged the services of a lawyer-accountant who specialized in estate planning. The ever increasing value of his glass sand company holdings and the impact of death taxes seemingly led the testator to increase his tax exempt testamentary gifts. The 1954 will and both of the 1956 wills bequeathed all of the rest and residue to exempt legatees. The testator was anxious that his shares of stock in the glass sand company should be retained by the legatees so far as feasible after his death. Accordingly, in all five of his wills he expressed a wish that the individual legatees would, and required that the trustees for the residuary legatees should, keep the stock for a period of ten years after his death, and that the trustees should give proxies to Abraham J. Fink and the company's president for all meetings of stockholders during that period.

In 1947 the testator entered Johns Hopkins Hospital for treatment of a severe infection of the urinary tract and the physician who treated him entered on the hospital record an impression note to the effect that the patient appeared to be "somewhat senile." Two days before his death in 1956 when the testator was taken to the hospital in a state of complete collapse an interne entered on the record an impression of "senile dementia", but this was not included in the notes of the attending physician.

When he left the hospital in 1947 the testator took up residence in a hotel across the street from his law office. He

lived there for the remaining years of his life, except for vacations to Nova Scotia and Atlantic City, attended by his chauffeur-valet and by nurses on twenty-four hour duty. He was a "fresh air fiend" by his own description, and his room was always cooled and aired to a degree deemed to be unreasonable by others. He slept under pongee coverings instead of blankets. As he had done for years, he shuffled in walking. He was an epicure and a connoisseur of wines, and, to the end, selected his meals and wines and signed the checks for them. He was not precise in his speaking, and sometimes mumbled and slurred his words, spilled cigar ashes and food on his clothing, drooled, and occasionally, towards the last, was incontinent. He found it tiring to read and read only the headlines and market reports. He would converse with those with whom he had a common interest—for example about sports with his valet—but if he was not interested he would either say nothing or reply with a grunt. Sometimes he would repeat a question. Most of his waking hours were spent in an armchair watching television. Often he solved the problem of choosing which program he would watch by having the visual action of all three of his sets turned on at the same time, with one channeled to each of the three different Baltimore stations. Normally, however, he would have the sound effect tuned in on only one at a time.

It was shown that the trusted private secretary of the testator had long had a power of attorney to sign his checks, that she performed other business and legal duties for him, and that it was she who suggested one of the cousins of the testator, Oliver S. Mullikin, Esq.,—the only other lawyer in the family—as an executor and trustee.

It was also shown that the lawyer-accountant drew the will as instructed and read it word by word to the testator, who followed the reading from a copy he held, and after minor typographical corrections had been made by his secretary, he signed it at the desk in his room.

It was also shown that Dr. Richard D. Weigle, president of St. John's College, and Richard F. Cleveland, Esq., a member of the Board of Visitors and Governors, on or about the last of June in 1955, solicited a substantial gift from the

testator, and, believing it to be true, told him that such gift would be matched by the Old Dominion Foundation. The testator gave assurances that a gift would be made in the near future, but later it became necessary for Mr. Cleveland to advise the testator that a matching gift would not be made available to the college under a proposed testamentary gift until *after death*. Subsequently a small gift was made without solicitation, and sometime later—on May 15, 1956—the testator signed a commitment to make. a bequest to St. John's in the amount of $500,000, in the hope that it would be matched. The legacy provided in the will of October 19, 1956, as well as in the two immediately prior wills, of one-fourth of the rest and residue of the estate, not only met, but exceeded, the commitment.

### The Evidence Questions

The caveator claims that she, her son, four of the nurses, who attended the testator, and his chauffeur-valet were competent to express an opinion as to the testator's lack of capacity to execute a valid deed or contract. One who is neither a subscribing witness nor an attending physician is not competent to express an opinion as to the capacity of a testator without first establishing facts upon which such opinion adequately may be founded. *Sellers v. Qualls,* 206 Md. 58, 110 A. 2d 73 (1954); *Wood v. Hankey,* 133 Md. 389, 105 A. 430 (1918); *The Berry Will Case,* 93 Md. 560, 49 A. 401 (1901). And this is so even though the observation of the testator by the witness may have extended over a long period of time as was true of the relatives and the chauffeur-valet. *Plummer v. Livesay,* 185 Md. 450, 44 A. 2d 919 (1945); *Cronin v. Kimble,* 156 Md. 489, 144 A. 698 (1929). The foundation on which these witnesses based their opinions was, however, no more than a combination of physical infirmities and characteristic oddities of the testator, and was not sufficient to demonstrate competency to express an opinion as to mental capacity or the lack of it.

This same reason justified the refusal of the trial court to permit the nurses to testify as to the entries they had made in the nursing charts concerning the mental condition of the

testator as distinguished from the facts concerning his physical condition which they were allowed to state. While the charts would have been admissible as entries made in the regular course of business under Code (1957), Art. 35, §§ 59, 60, it does not follow that everything in them was competent evidence. We think it is clear that the statute did not modify or alter the rule which forbids an expression of opinion by a person who is not competent to express an opinion. *Baltimore & Ohio R. R. Co. v. Zapf*, 192 Md. 403, 64 A. 2d 139 (1949); *Old v. Cooney Detective Agency*, 215 Md. 517, 138 A. 2d 889 (1958). See also *Globe Indemnity Co. v. Reinhart*, 152 Md. 439, 137 A. 43 (1927), decided before the enactment of the business records statute.

The caveator also offered the testimony of two nonattending doctors as medical experts. One was an internist. The other was a psychiatrist. Neither had ever known or seen the testator. Both had read the hospital records and heard the testimony of the attending nurses, and one had also heard the testimony of the chauffeur-valet as to the physical condition and eccentricities of the testator. The court refused to permit either to express an opinion as to competency. The hypothetical questions put to them may well have been faulty in form in that they did not eliminate consideration of the opinions and inferences of others, but the more basic and fundamental defect was that the doctors, like the lay witnesses, had no sufficient factual basis on which an opinion could be expressed. The psychiatrist admitted that there was not enough information in the hospital records for him to form an opinion as of October 19, 1956, as to the mental condition of the testator. The internist stated that he relied on the hospital note, made in 1947, with respect to the "somewhat senile" condition of the testator and admitted that this is a term referring to physical aging and not necessarily to mental capacity. Essentially, neither doctor had enough information on which to base an opinion other than the testimony of the nurses and the chauffeur-valet and that was not enough. *Sellers v. Qualls, supra. Horner v. Buckingham*, 103 Md. 556, 64 A. 41 (1906). "When evidence to show mental incapacity relates to circumstances which are not ob-

scure and need no explanation by a physician, and are legally insufficient to support an inference of incapacity, the testimony of a medical expert is not admissible to show that he draws such an inference from such evidence." *Grant v. Curtin,* 194 Md. 363, 384, 71 A. 2d 304 (1950). We think the opinions of the doctors were properly excluded.

The suggestion that the attending nurses, particularly the psychiatric nurse, were qualified to express an opinion under the rule which permits attending physicians to express an opinion without establishing a basis for it, is without merit. Cf. *Dashiell v. Griffith,* 84 Md. 363, 370, 35 A. 1094 (1896); *Gesell v. Baugher,* 100 Md. 677, 684, 60 A. 481 (1905).

We find no substance in the other questions raised as to rulings on the evidence.

### The Issues.

On the admissible evidence, hereinbefore summarized, the caveator contends that the jury should have been allowed to pass on the five issues—the execution of the will, testamentary capacity, undue influence, fraud, and whether the will was the "will" of the testator.

### (i). Execution of the Will.

The caveator's claim that proper execution had not been shown was based on the fact that the testator made no comment as the will was read to him. The subscribing witnesses—the scrivener and the secretary—testified that the will was duly and properly executed. There was no testimony to the contrary. Indeed, counsel for the caveator admitted in the trial court that due execution of the will had been established. The *prima facie* effect of the attestation clause, supported by the testimony of the subscribing witnesses, remained unimpeached. *Woodstock College v. Hankey,* 129 Md. 675, 99 A. 962 (1917); *Van Meter v. Van Meter,* 183 Md. 614, 39 A. 2d 752 (1944); *McIntyre v. Saltysiak,* 205 Md. 415, 109 A. 2d 70 (1954).

### (ii). Testamentary Capacity.

Mental incapacity is claimed to have been shown by the evidence of the testator's physical condition and habits,

which, it is urged, were enough to support the opinions that several of the relatives, four of the attending nurses, his chauffeur-valet and the two medical experts, were prepared to give that the testator was incompetent. We think, as we have already stated, that the trial court properly ruled this opinion evidence was not admissible.

The caveator admitted that she had not thought of questioning the testator's mental capacity or the validity of the will until she had read it. Then she "changed [her] mind" because she "decided that there must be something wrong." It was the thought that most of the estate went to charity and not to the testator's relatives that caused her to change her mind. "The longer [she] thought about it, the more [she] thought [she] was entitled to a little more. * * * [and that] it wasn't right." This was not an uncommon reaction. See *The Berry Will Case, supra,* at p. 564.

The testimony of the caveator and her son, the son's wife and another cousin, who, except the son's wife, had known the testator all their lives, that of the four nurses, who had attended the testator for varying periods from nine days to nine months, and that of the chauffeur-valet, who had been employed for nearly twenty years, was, to reiterate, no more than a description of the physical infirmities and certain characteristic oddities of the testator which each had observed from time to time during the period each had known him. Evidence sufficient to show lack of testamentary capacity cannot be based on the fact that the testator drooled, was incontinent and needed support when walking and had other physical debilities [*Jones v. Collins,* 94 Md. 403, 51 A. 398 (1902)]; nor on the fact he spilled food and cigar ashes on himself [*Sellers v. Qualls, supra*]; nor on the fact he was not clear and precise in his speech [*Gesell v. Baugher,* 100 Md. 677, 60 A. 481 (1905)]; nor on the fact he answered questions with a grunt or mumbled and slurred his words [*The Berry Will Case, supra; Plummer v. Livesay, supra*]; nor on the fact he would converse with his valet but refused to engage in conversation with his nurses [*Acker v. Acker,* 172 Md. 477, 192 A. 327 (1937)]; nor on the fact he would ask a question over again within a brief period [*Davis v. Denny,*

94 Md. 390, 50 A. 1037 (1902)]; nor on the fact he had a shuffling gait [*Scheller v. Schindel,* 153 Md. 547, 138 A. 415 (1927)]; nor on the fact he wanted three televisions operating at the same time [Cf. *Grant v. Curtin, supra*]; nor on the fact he disliked to stay alone at night and had an aversion to heat—assuming such dislikes are eccentric instead of normal [*Sellers v. Qualls, supra*]. The refusal of the trial court to submit this issue to the jury was proper.

### (iii). Undue Influence.

This contention is directed at the secretary, the scrivener and the testator's closest friend—Abraham J. Fink—with whom he had been associated during much of his adult life in acquiring his extensive interest in the glass sand company which *is* his estate. Because the testator trusted his secretary and followed her suggestion as to the nomination of a cousin as one of the executors and trustees; because the services of the scrivener led to increasing the share of the estate which was bequeathed to charity; and because the testator was fond of and trusted his friend and named him in his will as one of the proxies to vote the glass sand stock bequeathed in trust during the ten-year period fixed by the will, it is claimed that these three persons exerted undue influence on the testator. The secretary received little more under the probated will than she was bequeathed in the earlier wills. The scrivener derived no benefit from any of the wills other than the fees he received as the lawyer and accountant the testator had retained during the last three years of his life, and, the testator, by his last will, not only removed his closest friend as one of the executors and trustees, but reduced the legacy of 10,000 shares in the glass sand company which he had bequeathed to him in all prior wills to 2,500 shares and a portrait appraised at $25—a reduction in excess of $450,000. Clearly these charges of undue influence were no more than unsubstantiated conjecture and suspicion which did not warrant submission of this issue to the jury. *Davis v. Calvert,* 5 Gill & J. 269, 302 (1833); *Stockslager v. Hartle,* 200 Md. 544, 92 A. 2d 363 (1952). The evidence produced by the caveator, including that of Judge Morris A. Soper, showed

the testator was a strong willed man who did as he pleased. There was nothing to show he had done otherwise in making his will.

### (iv). Fraud.

The issue as to fraud was abandoned in the trial court, and should not have been raised here. Even if it were before us, we find nothing in the record which would have warranted the submission of this issue to the jury. The alleged fraud was based upon the manner the irrevocable commitment to make a gift to St. John's College was procured. The evidence tended to show that the testator exercised, in the words of the trial judge, a "keen intellect" as to all details and connotations of the matter, and fell far short of showing misrepresentation. The testator informed Judge Soper in March of 1956—when the judge visited the testator to further solicit a gift for Goucher College—that he was not disposed to part with his estate or any substantial part of it during his lifetime; that it gave him a sense of satisfaction to deal with the property himself; that he thought he knew more about it than anyone else; that he believed it was to the best interests of those concerned for him to continue in control during his lifetime; and that his chief interest was in St. John's College because he had graduated there, that St. John's needed the money, and that his first loyalty was to it. In any event fraud in procuring a legacy would not invalidate the will although it might the legacy, but that question was not raised. See *Griffith v. Diffenderffer*, 50 Md. 466, 489 (1879).

### (v). The "Will" of the Testator.

Since there was nothing in the record to show that the first four issues should have been answered other than as the court directed, it follows as of course that the paper writing dated October 19, 1956, was *indeed* the last will and testament of Addison E. Mullikin, deceased, and was therefore properly admitted to probate by the Orphans' Court.

*Rulings affirmed, the appellant to pay the costs.*