## GIARDINA ET AL. *v.* WANNEN ET AL., EXECUTORS

[No. 137, September Term, 1961.]

118

*Decided March 19, 1962.*

The cause was argued before HENDERSON, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Francis X. Gallagher,* with whom were *Edwin A. Gehring* and *H. B. Mutter* on the brief, for appellants.

*Robert J. Martineau* and *H. Vernon Eney,* with whom were *Venable, Baetjer & Howard* on the brief, for appellees.

PRESCOTT, J., delivered the opinion of the Court.

Questioned in this appeal are the trial judge's rulings, in the Court of Common Pleas of Baltimore City, in instructing the jury to make certain answers to issues that had been trans-

mitted to that court from the Orphans' Court, resulting from caveat proceedings relative to the purported last will and testament of Maria Fava; and the trial court's refusal to admit certain evidence proffered by the caveators.

Six issues, in usual form, were sent to the trial court. They raised these questions: (1) the execution of the will; (2) knowledge and understanding of its contents by the testatrix; (3) undue influence; (4) mental incapacity; (5) fraud; and (6) the factum of the will. The appellants concede the trial court's instruction relative to Issue No. 1 was correct; and also that the answer to Issue No. 6 was properly directed, unless one or more of the other issues should have been submitted to the jury. In addition, they conceded at the trial below that they had not offered sufficient evidence to require the jury's passing upon Issue No. 3. Hence, we need only consider the court's rulings on the questions of evidence and on Issues Nos. 2, 4, and 5, which we shall do after stating the facts.

Maria Fava was born in Sicily in 1885. When she was fifteen years of age, she was married to her first cousin Giovan Fava, popularly known as Jim Fava. In 1901, they came to Baltimore, where two of Jim's brothers, Salvatore (Sam) and Francisco (Frank), and their wives were operating the Savoia Restaurant. After their arrival in Baltimore, Jim and Maria went to live with Sam and Frank and their wives in an apartment over the restaurant, and made their home there until about 1907, when Andrew, the first child of Frank, was born.

Jim Fava founded the G. Fava Fruit Company (Fruit Company or Company) about 1908, and it and its affiliates were the foundation of the Fava fortune.

Maria Fava was one of a family of three sisters, and when Jim and Maria came to Baltimore in 1901, Maria's two sisters, the appellants, were living in that city. The elder, Concetta Mortillaro, had three children. Her son, Louis (who was a witness in the case) had two children of whom the elder, Concetta, married Eugene Pierelli (another witness). Maria's other sister, Josephina Giardina, had three children, of whom her son Joseph, and her daughter, Concetta Brocato, were witnesses.

Jim and Maria had no children; neither did his brother Sam, nor, apparently, any of his other siblings, except Frank, who had eight children living at the time of testatrix' death. These eight nieces and nephews of Jim Fava, who were also first cousins once removed of the testatrix are the principal beneficiaries under her will.

The Fruit Company prospered and grew. Sam and Frank remained in the restaurant business, but in the course of time, four of Frank's sons and the husband of one of Frank's daughters went to work for Jim in the fruit business. The eldest son, Andrew, ultimately became president of the business, and the second son, Joseph, the vice-president. Frank's other two sons remained with their father and actively participated in the restaurant business.

Early in the business career of Jim Fava, he became acquainted with William Wannen, and later with his brother Carl Wannen, both of whom were, and are, Certified Public Accountants. This acquaintanceship continued throughout the lives of both Jim and Maria, and the testimony makes it clear that not only did Carl Wannen, in his professional capacity, supervise the financial affairs of the Fava interests, but he also became the close and trusted adviser of Maria Fava and acted in that capacity for many years. The Wannens were named as executors by the testatrix, and are the appellees here, as executors and administrators *pendente lite.*

Jim died in 1948, testate. He left his stock in the Fruit Company in trust for the benefit of Maria for life, with remainder to his three nephews and his niece's husband (the niece also shared with her husband), who had been active in the business with him; namely to Andrew Fava 40%, to Joseph Fava 30%, to Andrew and Cecilia Ferlita 20%, and to Samuel Fava 10%. The trustees were Maria Fava, the oldest nephew Andrew Fava and Herman Moser (later Judge Moser). John Fava, the other nephew who became active in the business, was only 15 years of age when Jim died.

Maria Fava was a firm-willed woman of strong likes and dislikes, who insisted upon things being done her way. As one witness stated it, she insisted on "being boss." After her hus-

band's death, she felt that she should step into his shoes and run the business, something which the nephews, who were interested in the Company, were unwilling for her to do. She apparently resented this opposition to her becoming president of the Company. Also, for a time after her husband's death, she was paid a salary of $10,000, per year, by the Company but when the Internal Revenue Service objected to the same as excessive, the amount of the salary was reduced to $100, per week, and she, likewise, resented this. She attempted to gain control of the board of directors, so she could be elected president, but quickly abandoned this effort when she found out the "boys" would leave the business if she were successful. Her unfilled desires led, at times, to tirades by her against some of the nephews, especially Andrew, who was president of the Company.

After her husband's death, she went, except when ill, downtown every Tuesday and Thursday. These trips were for both personal and business reasons: on both days she went to the office of the Company and countersigned a large volume of checks, and then she would go shopping, pay bills, and visit her hairdresser, etc. Also, she would spend considerable time on Hutzler's balcony, where relatives would stop by to see her and she would chat with strangers. These trips continued until very shortly before her death.

In the period between her husband's death and her own, the testatrix had three operations: the first was on her eyes; the second, in 1954, was for a ruptured disc in her back, and the third was a colostomy performed on September 2, 1958. She was hospitalized for the colostomy from August 26 to September 16 and from September 24 to September 30, 1958, after which she returned to her home.

In November, 1958, the textatrix consulted Richard W. Case, Esquire, of the Baltimore Bar in connection with her will. On November 21, 1958, she executed a will in the sun-parlor of her home in the presence of Mr. Case, his law partner, William B. Somerville, Esquire, Carl Wannen and his wife, and William Wannen. Before its execution, the will was read and explained to the testatrix in English by Carl Wannen in the presence of the other four persons named above.

Beginning the first Tuesday after November 21, (the date of the will) Maria again began going downtown each Tuesday and Thursday as she had before, and by Christmas time, her condition was much improved and she seemed in good spirits.

In February, 1959, Maria made a gift of $10,000 to Mary (her godchild and a relative) and Robert Cimino, Mary's husband. And, in March and August, 1959, she made gifts of $10,000 and $20,000, respectively, to Concetta Brocato, one of her sister's children.

The will is a simple one. The testatrix leaves a legacy of $10,000 to each of her two sisters and a $5,000 legacy to her godchild and the latter's husband. Taxes on these legacies are directed to be paid by the estate. The rest and residue of her estate is left in varying shares to the six nephews and two nieces of her husband (also her first cousins once removed) and their respective spouses, the smallest shares going to the ones who were not active in the fruit business. The net distributable residue is some $198,000, which means, if the $40,000 in gifts to Mrs. Brocato and the gift to the Ciminos are taken into consideration with the bequests in the will, that the testatrix' two sisters, one of their children, and the Ciminos will receive about one-fourth of her bounty, and the nieces and nephews mentioned above the other three-fourths.

Mrs. Fava lived alone, except during the trips to the hospital and the periods of convalescence, in a handsome and commodious home. Although the house was kept immaculately, she did not require the assistance of the "cleaning woman" during the last six months of her life; and from early July until her death, the practical nurse visited her only two or three times a week, each visit lasting about two to three hours. Maria died on October 26, 1959, in the hospital, where she had been taken the previous day after being found unconscious on the floor of her house.

I

The appellants' first assignment of error is a claim that the facts testified to by the witness Grace Duncan, a practical nurse, were sufficient to entitle her as a lay witness to ex-

press an opinion as to the mental incapacity [1] of the testatrix at the time of the execution of the will. This nurse attended Maria from September 30th, when she returned from the hospital, until November 21st, the date of the will, for eight hours each day. During the remaining sixteen hours, Maria remained alone and took care of herself completely. After November 21st, the nurse attended Maria, for shorter periods of time, until Maria's death.

Without attempting to detail all of the nurse's testimony, a summary of the foundation for the claim that she was entitled to express an opinion follows: (1) her observations of the testatrix' physical ailments, such as backaches, nausea, vomiting and blackouts; (2) the testatrix had lapses of memory, and her "memory was poor," as she often asked what day, or what time, it was; (3) the testatrix failed to carry out her instructions, and there were certain actions of testatrix that "didn't make sense," *e.g.,* the testatrix would insist upon finishing a bath in which fecal matter from her side had come, and sometimes she would not have on her abdominal bandage or colostomy bag, and fecal matter would be on her hands, the bed, or the floor; and (4) the testatrix said things which to the witness failed to make sense, for instance, on occasion she insisted her deceased husband was in the room with her, at times she, seemingly, sat in a trance, she talked to herself, and she refused to accept the fact that she had had a colostomy operation, as a result of which her bowels would never again function in a normal manner, and instead was insistent on having the operation "reversed."

The physical ailments and disturbances described by this witness seem less severe and little different than physical infirmities which in many cases decided by this Court have been determined to be insufficient to establish a lack of mental capacity, or to form a foundation to express an opinion relating to the mental incapacity of one who has executed a will. See *Arbogast v. MacMillan,* 221 Md. 516, 522, 158 A. 2d 97;

---

1. For the mental capacity needed to make a valid will or testament, see Code (1957), Article 93, Section 349, and Sellers v. Qualls, 206 Md. 58, 110 A. 2d 73.

*West v. Fidelity-Baltimore Nat'l Bk.,* 219 Md. 258, 264, 147 A. 2d 859; *Sellers v. Qualls,* 206 Md. 58, 68, 110 A. 2d 73; and *The Berry Will Case,* 93 Md. 560, 49 A. 401, for a few of the Maryland cases dealing with the subject. This Court has also held that observations of a witness of mere forgetfulness or lapses of memory on the part of a testator do not constitute a sufficient foundation for expressing an opinion concerning mental incapacity. *The Berry Will Case, supra.* The testatrix' alleged inability to keep track of the time of the day or the day of the week is merely another way of claiming her memory was poor, but it is quite likely that a person of good memory, when confined to her home by sickness for several months, will either find difficulty in keeping track of the hours and days, or will not take the trouble to do so.

The witness' claim that the testatrix would not carry out her instructions is not very specific in details. However, the evidence is quite clear that there were clashes between the nurse and patient. We stated above that the testatrix was a firm-willed person and liked to do things her own way. The nurse made much of the fact that on occasions Maria failed to have on her colostomy bag or an abdominal bandage (whether this was intentional or the bag came off by accident is not entirely clear), and, as a consequence, fecal matter would be on her hands, the bed and the floor. Here was a woman, who had recently undergone a very serious operation, requiring a most unpleasant and discomfiting manner of disposing of her human waste, which was entirely new to her. When the bag or bandage would come off, it would result in a displeasing situation, in which the nurse occasionally found the testatrix. Whether or not the wearing of the bag or bandage was painful to a new patient, we do not know, but it may be safely assumed, we think, that it was most disagreeable. Without unduly prolonging the consideration of this matter, we see little relation between the fact that a new colostomy patient does not handle her bag and bandage with all of the care, skill and acumen that a nurse would desire and the mental capacity of the patient. Cf. *Arbogast v. MacMillan, supra.* Much of what has

been said above would also apply to the alleged insistence by the testatrix of bathing in water containing fecal matter, and her efforts to have the colostomy "reversed." The testimony disclosed that the testatrix dreaded the irrigating process and its accompanying bath, and it is certain she desired to have both of them finished as soon as possible. The nurse, probably quite properly, thought that if any fecal matter came out of Maria's side during the bath, she should get out of the tub, have the impure water drained and new water drawn to complete the bath. Maria's choice of finishing the bath as soon as possible, although not a selection which everyone would make, was not so unreasonable as to create a foundation for the witness expressing an opinion on the testatrix' mental incapacity. The contention with reference to her efforts to have the colostomy "reversed" is quite frivolous. Testatrix had heard that it was possible to have the colostomy reversed, and the patient would again function in a normal way. Being of a strong will and unwilling to resign herself to the colostomy permanently without making every effort to rid herself of it, she made several visits to doctors to see if it were possible to have a colostomy reversed. We see no indication of mental incapacity in this conduct. Finally, if the allegation that she believed her deceased husband was, at times, in her presence be considered as showing a belief in spiritualism by the testatrix or a delusion upon her part (a matter that we do not decide), it avails the appellants nothing in the present situation. A belief in spiritualism is no evidence of mental incapacity, *Mecutchen v. Gigous,* 150 Md. 79, 84, 132 A. 425, and a delusion is not sufficient evidence to warrant a finding of lack of capacity, unless the will is the product thereof. *Sellers v. Qualls, supra.* We hold the trial court was correct in not permitting the witness, Duncan, to express an opinion as to testatrix' mental incapacity. It is well established, of course, that the foundation laid to permit an expression of opinion as to incapacity must be more substantial than one to express an opinion relative to mental capacity. *Masius v. Wilson,* 213 Md. 259, 131 A. 2d 484.

## II

We deem it proper, at this time, to consider and determine the correctness, *vel non,* of the trial judge's ruling on Issue No. 4 (mental capacity), although this is not the order in which the question is presented in the briefs. The appellants quite properly state, "the evidence pertaining to this issue is to a great degree included in the testimony of Mrs. Grace Duncan." Of course, the question decided under I above was that the witness Duncan had not shown a sufficient foundation to express an opinion on the testatrix' incapacity. Her testimony that was admitted must be considered for whatever it is worth with any other relevant testimony bearing upon mental incapacity, but we find little to bolster or to add to what she stated. The only further argument advanced by the appellants upon the subject is a claim that Maria was unable "to comprehend the only business transaction in which she participated between the time of the colostomy and the end of November 1958, viz., the will." This contention merely begs the question, and will be answered fully under IV, *infra.* It is interesting to note the evidence shows that within six weeks after the will was executed, a grandson-in-law of one of the appellants, a lawyer, was urging the testatrix to make a will as soon as possible, and this was done with the knowledge, and presumably the acquiescence, of his parents-in-law and his grandmother-in-law. Also, it is clear from the evidence that Mr. and Mrs. Cimino did not question the mental capacity of Mrs. Fava when she gave them $10,000; and the same is true concerning Mrs. Brocato when she received $30,000 from the testatrix. Appellants, in the brief, elaborate quite extensively on alleged oral statements made by the testatrix to the effect that she disliked some of the legatees, and did not intend to reward them with her bounty. The provisions of a will, without additional evidence, cannot constitute legally sufficient evidence of mental incapacity. And statements, made in a will or when the will was made, at variance with alleged prior or subsequent oral statements, cannot be made evidence of mental incapacity by calling them delusions. *Grant v. Curtin,* 194 Md. 363, 71 A. 2d 304.

## III

We pointed out above that Maria Fava was a Sicilian by birth, who came to this country as a teenager, and lived here for nearly 60 years before her death. Witnesses testified that the Sicilian language is a phonetic rather than a written one, and the testatrix could neither read nor write English. Maria usually conversed with her relatives, at least those of the older generation, in Sicilian, but she had many dealings and conversations with others who could not speak Sicilian.

In an attempt to show the testatrix did not know and understand the contents of her will (Issue No. 2), two questions, almost identical in form, were put to witnesses Concetta Brocato and Andrew Cullota. The witnesses were asked if they could express an opinion as to whether or not the testatrix could have understood the will or its contents if it were *read* to her in English. Both witnesses said they could but, upon objection, were not permitted to give their opinions. If we assume, without deciding, that the lay witnesses had laid proper foundations to express opinions and that the court was in error in excluding their opinions, the appellants' cause was not harmed by this action of the court. For the crucial test was whether the testatrix *actually understood* the nature and contents of the will, not whether she could have understood the same by having it *read* to her. No substantial evidence showing that the testatrix could not have *understood* the will if it were *explained* to her in English was adduced; consequently, the court would have been required to direct an answer to Issue 2 just as it did, even had the opinions been received. As a matter of fact, the parties stipulated that the will "was not read by her [Maria] but was read to her by Carl Wannen in English and was explained to her by Carl Wannen in English * * *." Thus, it is seen that this contention of appellants is not only unsound, but is contrary to the provisions of the stipulation.

## IV

What we have just said almost disposes of appellants' contention on Issue No. 2. The requirement of knowledge and understanding of a will by a testatrix has frequently been

stated in the following manner: It must appear that at the time of making the will, the testatrix had a full understanding of the nature of the business in which she was engaged, a recollection of the property of which she intended to dispose and the persons to whom she meant to give it, and the relative claims of the different persons who were or should have been the objects of her bounty. Under this contention, appellants repeat many of the same arguments made above. About the only one we have not mentioned is the claim that she did not know she had made a will; because she purportedly denied to certain of her relatives that she had done so. The record makes it clear that several of the relatives on the appellants' side of the family were most persistent in attempting to find out whether Maria had made a will or not. Her purpose in not disclosing to them that she had executed a will we shall never know, but we do know that there is nothing very unusual about the fact that some people feel that the making of a will is their own business and not that of others. Cf. *Malone v. Malone,* 148 Md. 200, 206, 129 A. 10. By the uncontroverted testimony of the attesting witnesses, the will was executed with all of the formalities required by law. By stipulation it was *read* and *explained* to her in English. Mrs. Cimino, a witness offered by appellants, stated that the testatrix "spoke" the English language a little better than her sister, the appellant Mrs. Giardina. Mrs. Giardina thereafter took the stand, and, without difficulty, answered in English some 165 questions propounded to her in English. She related in detail the members of her family; the ages of many; the places and length of their employment over the years; the dates of the death of some; her visits to her sister during Maria's illnesses; the attendance of the nurse, Duncan; and many other matters, displaying that she could easily have understood the will involved herein, if explained to her in English. We are unable to find sufficient evidence in the record to have required the submission of the issue to the jury.

V

This leaves for consideration the issue of fraud and it may be disposed of rather summarily, for we find no evidence in

the record indicating fraud. Fraud connotes that the testatrix either did not know that she was signing a will, or that she was misled or deceived as to the provisions of the will. *Davis v. Calvert,* 5 G. & J. 269. The appellants attempt to sustain their claim by asking such questions as: "Why did Carl Wannen read the will to her [testatrix]?—why didn't the draftsman? Who selected the draftsman—Carl Wannen? Why didn't Mrs. Fava know the name or names of the lawyers?—or where their office was located? [Of course, this assumes that she did not have this knowledge]" etc. There is a full and complete answer to each of these questions, such as Carl Wannen was the natural one to read and explain the will, being testatrix' long and trusted advisor and having had numerous conversations and transactions with her; but there is a complete, though short, answer to all of them. This answer can be given by paraphrasing Judge Markell's language in *Grant v. Curtin, supra,* 194 Md. at page 383: "Anyone with sufficient faith in the depravity of mankind is at liberty to assume or suspect that Carl Wannen and his wife, and William Wannen, and Richard W. Case, Esquire, and William B. Somerville, Esquire, any one or more of them, in some way, participated in a deception of Mrs. Fava as to the nature of the document which she signed on November 21, 1958, or as to its contents. But there is no evidence to support such suspicion."

Finding no error,

*The rulings are affirmed; appellants to pay the costs.*