## DIETZ ET AL. *v.* MOORE ET AL.

[No. 94, September Term, 1975.]

*Decided February 6, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*M. Michael Maslan* and *Kathryn E. Koshel,* with whom was *Charlotte W. Pine* on the brief, for appellants.

*Robert J. Ryan* and *J. Norris Byrnes,* with whom were *Moore, Hennegan, Carney & Ryan* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court.

Charles Earl Laudenklos died on January 23, 1974, approximately 15 hours after executing his one and only last will and testament. That document, which was submitted to the Orphans' Court for Baltimore County for probate five days later, was challenged in two caveat proceedings by 32 of his relatives as not being a valid testamentary instrument. With the agreement of the parties, the orphans' court transmitted eleven issues — including execution, undue influence and mental competency — to the Circuit Court for Baltimore County for determination. Following a two-month discovery period, the caveatees filed a motion for summary judgment which, after a hearing, was granted as to ten of the issues, leaving only the question of the mental competency of the testator to be decided at trial. After also losing on that issue in a jury trial before Judge Frank E.

Cicone, the caveators press the following three issues on appeal: (1) whether summary judgment should have been granted on the issues of execution and undue influence; (2) the propriety of the conduct of the personal representative-caveatee in connection with this matter; and (3) whether the trial court erroneously refused to allow the jury access to certain para-medical evidence. Although appeal was taken to the Court of Special Appeals, we granted certiorari before it considered the case. As we discern no prejudicial error, the rulings of the circuit court will be affirmed.

The circumstances shrouding the last few days of the decedent's life seem almost perfectly orchestrated to give rise to a will contest. Laudenklos, diagnosed in September of 1973 to be suffering from Hodgkins disease, was hospitalized on January 3, 1974, due to an increasingly deteriorating condition. When his tenuous grip on life began to slip, his pastor, at the urging of some of the caveatees, asked him on January 21 whether he had made a will. After replying in the negative, Laudenklos consented to the summoning of E. Scott Moore, his lawyer and a caveatee. Moore visited the decedent in the hospital later that same afternoon and, according to Moore's testimony, he discussed with Laudenklos the disposition of his property and was requested by him to prepare a will. Returning the next morning with a secretary from his office, as Moore and his secretary testified, Moore read Laudenklos a typewritten will that he had prepared and then Moore, at the decedent's request, in his own handwriting crossed out one legatee and added two other beneficiaries. After that was accomplished, according to these same testifiers, Laudenklos, with Moore and his secretary as the subscribing witnesses and the only persons present, signed the will with his mark, an "X." Mr. Laudenklos died 15 hours later. There was conflicting testimony regarding the testator's mental awareness at the time the will was executed, with some persons attesting to his coherence and ability to communicate, and others relating that he was disoriented and bewildered during his final days. The seven legatees named in the will, each of

whom was to receive 15% of the estate (except one husband and wife were together bequeathed 15%) were his church, four friends and two cousins, most of whom had visited Laudenklos within days of his death. The caveators, consisting of 32 paternal heirs, collectively receive only 5% of the estate under the will; they would receive 50% had the testator died intestate.

The caveators argue that the circuit court should not have granted the caveatees' motion for summary judgment as to the issues of execution and undue influence because at trial the jury may not have believed the testimony of the subscribing witnesses. Contending that the underlying facts are susceptible of more than one inference, the caveators conclude that the summary judgment invaded the province of the jury. However, properly granted summary judgments do not usurp any jury function since Maryland Rule 610 d 1 authorizes them only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." As we said in *Lynx, Inc. v. Ordnance Products*, 273 Md. 1, 7, 327 A. 2d 502 (1974), "[t]he function of the summary judgment procedure is not to try the case or decide the issues of fact raised; it is merely to determine whether or not there is an issue of fact to be tried and if there is none, to cause judgment to be rendered accordingly." Furthermore, we think it abundantly clear that the court below was correct in granting summary judgment as to the undue influence and execution issues. As Judge Finan aptly expressed the law for this Court in *Brown v. Suburban Cadillac, Inc.*, 260 Md. 251, 255, 257, 272 A. 2d 42 (1971):

"An appellate court, in reviewing a motion for summary judgment, should be concerned primarily with deciding whether or not a factual issue exists, and in this regard, all inferences should be resolved against the party making the motion. *Hilton v. Williams*, [258 Md. 285, 288, 265 A. 2d 746 (1970)]; *Lipscomb v. Hess*, [255 Md. 109, 118, 257 A. 2d 178

(1969)]; *Lawless v. Merrick*, [227 Md. 65, 70, 175 A. 2d 27 (1961)]. *Be that as it may, when the moving party has set forth sufficient grounds for summary judgment, the party opposing the motion must show with some precision that there is a genuine dispute as to a material fact. Foreman v. Melrod,* 257 Md. 435, 441, 263 A. 2d 559 (1970); *Fishman Const. Co. v. Hansen,* 238 Md. 418, 422-23, 209 A. 2d 605 (1965), and cases cited therein. And, the opposing party must make such a showing by facts which would be admissible in evidence. Maryland Rule 610 b; *Foreman v. Melrod, supra; Fishman Construction Co. v. Hansen, supra; Strickler Engineering Corp. v. Seminar, Inc.,* 210 Md. 93, 100, 122 A. 2d 563 (1956).

\* \* \*

"It is never sufficient to defeat a motion for summary judgment that the opposing party allege in a general way that there is a dispute as to a material fact. . . ." (Footnote omitted; emphasis added.) *See Lynx, Inc. v. Ordnance Products, supra,* 273 Md. at 7-9; *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 40-41, 300 A. 2d 367 (1973).

In this case, although the caveatees presented sufficient grounds for summary judgment as to the issues of execution and undue influence, the caveators utterly failed to establish that there was a "genuine dispute as to a material fact" as to either issue. With respect to execution, the caveators did not depose or obtain admissions from the two subscribing witnesses, and presented no affidavits nor any other admissible evidence indicating that the decedent did not sign the "X" on the will. This Court has held that "when a person signs his mark to an instrument with the intention of executing it as his will, the mark of itself constitutes a signature sufficient to comply with the statute." *Van Meter v. Van Meter,* 183 Md. 614, 619, 39 A. 2d 752 (1944). Similarly, the caveators presented nothing which would be

admissible at trial with regard to the issue of undue influence; the affidavits they rely on with regard to this issue go, in reality, only to the issue of competency, which was submitted to the jury.

We need only pause momentarily to consider the caveators' second contention. They assert that remand for a new trial is required because there exists "at least an appearance of impropriety" on the part of the personal representative-caveatee, E. Scott Moore, which results from his appearing in many capacities in this litigation.[1] Though this contention is set forth in the caveators' brief, the issue was, nevertheless, neither raised in nor decided by the trial court; so under Rule 885 we are not privileged to consider it. *Gillen v. Maryland Nat'l Bank*, 274 Md. 96, 106, 333 A. 2d 329 (1975); *Brawner v. Hooper*, 151 Md. 579, 594, 135 A. 420 (1926) (holding that conduct of counsel cannot be questioned for the first time on appeal).

The final facet of the caveators' appeal relates to use of progress notes made by several nurses on the two days immediately preceding the testator's death and which allegedly bear on the competency issue. The caveators urge that the three nurses testifying on the matter were erroneously prevented from utilizing their notes in aid of their testimony and from making known to the jury their recorded observations. Similarly, the caveators challenge the trial court's alleged refusal to allow their expert medical witness, Dr. Solomon Snyder, to use these notes in formulating his opinion. After first setting out some additional facts and a synopsis of the applicable law, we will consider these evidentiary issues with respect to each of the four witnesses.

A review of the trial proceedings discloses that during the

---

1. In connection with this matter Mr. Moore has indeed performed many disparate rolls — he was the draftsman of the will, an attesting witness, the designated personal representative, a named party defendant in his capacity as personal representative in these caveat proceedings, appeared pro se before the orphans' court, affiant in connection with the caveatees' motion for summary judgment in the circuit court, and both counsel for himself as personal representative and a witness in the jury trial conducted in the circuit court.

direct examination of the decedent's attending physician, Dr. Sheldon Kravitz, called at the outset of the trial by the caveatees due to the witness' schedule, counsel for all parties stipulated to the admission of the decedent's hospital record. This record, in its entirety, was then received into evidence without objection. Included in it — in addition to test results, X-ray data and physicians' progress notes — were the nurses' para-medical notes at issue here. The key notations made by the nurses are as follows: (1) Gloria Kruba, at 2:30 p.m. on January 21, stated that Mr. Laudenklos "Appears confused, disoriented. Does not give correct responses related to questions"; (2) Ruth Anna Shattuck, at 8:30 that same night, noted that the patient "Appears to be disoriented this evening"; and (3) Michael Sturm, at 1:30 p.m. the following afternoon, recorded that the testator "appears disoriented at times."

As we have held in numerous cases, hospital records are not inadmissible as hearsay in Maryland because they fall within the statutory business record exception now codified in Code, Courts and Judicial Proceedings Article, § 10-101 (1974). See, e.g., Dunn v. State, 226 Md. 463, 174 A. 2d 185 (1961); Beth. Shipyard v. Scherpenisse, 187 Md. 375, 50 A. 2d 256 (1946). However, even though a particular hospital record is not barred from evidence as hearsay, it may be that some or all of its contents are open to objection on other grounds. Old v. Cooney Detective Agency, 215 Md. 517, 524, 138 A. 2d 889 (1958). Thus, charts kept by nurses in the regular course of their profession are within the hearsay exception, Snyder v. Cearfoss, 190 Md. 151, 159, 57 A. 2d 786 (1948), but not everything contained in them is necessarily competent evidence. West v. Fidelity-Balto. Bank, 219 Md. 258, 265, 147 A. 2d 859 (1959). In West, for example, the Court refused to allow four nurses who had attended the testator to testify regarding their entries concerning his mental condition because they had not been shown to be competent to express an opinion as to his lack of capacity to execute a valid deed or contract. Id. at 264-65. The Court's premise, which we have since reaffirmed, was that one who is neither a subscribing witness nor an attending physician

8

is not competent to express an opinion as to testamentary capacity without there being established sufficient facts on which to base the opinion. *Id.; see, e.g., Williams v. Moran, Etc.*, 248 Md. 279, 286-87, 236 A. 2d 274 (1967); *Ingalls v. Trustees*, 244 Md. 243, 257-58, 223 A. 2d 778 (1966); *Giardina v. Wannen*, 228 Md. 116, 123-24, 179 A. 2d 357 (1962). Had the para-medical progress notes been objected to, in whole or in part, therefore, the trial court would have been required to determine how much, if any, of the notes constituted competent evidence. However, the circuit court was not required to decide that issue, nor are we, as counsel for all parties agreed unconditionally to the admission of the entire hospital record. As Judge Hammond stated for the Court in a similar context in *Old v. Cooney Detective Agency, supra,* 215 Md. at 525-26:

> "We need not decide whether the hospital records would have been admissible over objection, for they came in without objection. . . . If, for the argument, it be assumed that the evidence in the records was inadmissible . . . yet, since it came in without objection it had, for all purposes, the same intrinsic probative value and weight it would have had if competent evidence. . . . The general rule on the subject is well stated in *McCormick, Evidence,* Sec. 54 at 126: 'If the evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of whatever rational persuasive power it may have. The fact that it was inadmissible does not prevent its use as proof so far as it has probative value. Such incompetent evidence, unobjected to, may be relied on in argument, and alone or in part may support a verdict or finding. This principle is almost universally accepted, and it applies to any ground of incompetency under the exclusionary rules.' "

Turning to the testimony of the nurses, the caveators claim that Michael Sturm, who attended Mr. Laudenklos on

January 22, 1974, the date the will was executed, erroneously was not permitted to testify that the decedent, on that day, appeared disoriented. For several reasons, we reject this contention. As noted earlier, Sturm's para-medical entry to that effect was already in evidence and thus before the jury. Secondly, when on the witness stand, this nurse was never asked to read or relate the entries he made in the hospital record, and the caveators can hardly urge on appeal what they themselves failed to elicit. Moreover, Sturm was in fact permitted to describe to the jury his observations as to the decedent's condition. The record discloses the following colloquy:

> "(Mrs. Pine [attorney for caveators]) Q. Can you describe his condition on January 22, 1974?
>
> (Mr. Ryan [attorney for caveatee Moore]) Objection.
>
> (Mr. Byrnes [attorney for other caveatees]) Objection.
>
> (The Court) Insofar as he observed it?
>
> (Mr. Maslan [attorney for caveators]) Yes, your Honor.
>
> (Mrs. Pine) Insofar as he observed it by personal knowledge.
>
> (Mr. Ryan) His physical condition.
>
> (The Court) His physical condition, whatever you observed.
>
> A. [Mr. Sturm] He was a very sick man; I would say critical, as far as I have seen critical patients. He was very weak. His respirations were shallow. He was unresponsive most of the day.
>
> Q. Now, by unresponsive, what do you mean by the term, unresponsive?
>
> A. He didn't — if he was asked a question, at times he would not respond. He never gave any indication that he knew that I was in the room."

It appears, therefore, that the caveators' objection with regard to the witness Sturm borders on the frivolous.

The caveators next complain that another of their witnesses, nurse Ruth Anna Shattuck, was interrupted during direct examination when she tried to refer to her January 21 entry in the hospital record. The relevant portion of her testimony discloses the following:

"Q. [(Mrs. Pine)] And *when* was your first entry made [in the hospital record]?

A. 8:30 that evening, at which time I have written that he appears —

(Mr. Ryan) Objection.

(Mr. Byrnes) Objection.

(The Court) Sustained.

Q. From your review of the record, can you find any notation in there about a Foley Catheter with your signature next to it.

A. Yes, yes. May I say what that says?

Q. Well, from your own memory without reading —

(The Court) Just answer the questions as they are propounded to you.

A. Right.

Q. *Without reading from the record,* using the record to refresh your recollection, can you tell us what transpired on January 21st in the nursing capacity, in your nursing capacity for Charles Earl Laudenklos?

A. Well, I would say, having our usual procedure, I would go on rounds immediately, which was right after I report at about 3:30 in the afternoon, at which time we would have looked in on him, and again, apparently, according to my notes here, I have written something at 8:30, so I would have been in prior to that time, also. I think, again, that is all I have for that particular evening at 8:30. A man that critically ill, it would have been a question of just being in and out, possibly, returning, which we are supposed to do." (Emphasis added.)

The record of this interrogation indicates that the nurse was interrupted because her attempt to read the entry itself was unresponsive to the question as propounded, which merely related to *when* the entry was made. Counsel never asked the witness *what* the entry was; instead, the nurse was merely asked to use the record to refresh her recollection, and this appears to be a self-imposed limitation on the part of counsel for the caveators rather than an erroneous ruling by the trial court. Moreover, as we have noted, the para-medical progress notes themselves were already in evidence. The caveators' contentions with respect to nurse Shattuck's testimony, we conclude, are not well taken.

Concerning the testimony of the third nurse, Gloria Kruba, the caveators raise two points of error: that she should have been allowed to apply the term "disoriented" to the decedent and that she erroneously was not permitted to testify that "he seemed incoherent." In pertinent part, the record discloses the following:

"Q. [(Mrs. Pine)] The physical condition. Can you tell us his physical condition insofar as you observed on January the 21st [(the day before the will was executed)]?

A. Well, I remember him being very skinny, very weak, you know, just very weak, couldn't do anything, just laid there.

Q. Did you talk to him?

A. I remember talking to him, yes.

Q. *Did he answer you?*

A. *I don't remember any responses from Mr. Laudenklos.*

Q. Why do you ask questions of a patient such as Mr. Laudenklos; in other words, why did you ask him a question?

A. Well, it's a good nursing practice to observe the patient very carefully physically and mentally, and this would have to do with, for instance, if the patient was disoriented, you know, or just didn't

know what was going on, you wouldn't try and feed him, * * *. I would check on the patient just because it's a good nursing practice; you know, you observe the patient, make sure that he is still breathing and he is still with you, you know.

Q. You can tell if he is breathing without talking to him. Why did you speak to Mr. Laudenklos?

A. Well, he just struck me — *it seemed like he was very confused,* and I just wanted to establish whether the man was, you know, was there or not.

Q. Well, can you tell us what you mean by your statement of disoriented?

(Mr. Byrnes) Objection.

(The Court) Her statement of disoriented, what that means, it may not pertain to this case.

(Mrs. Pine) She used this case.

(The Court) What does that term mean? Not associated with this particular patient?

(Mrs. Pine) Not associated with anything, just what does she mean when she says disoriented?

(Mr. Byrnes) I would object as to relevancy.

(The Court) Overruled.

A. Disoriented, to me, would mean the person — that a person does not know what is going on, doesn't know where he is, doesn't know what time it is, doesn't know who's in the room with him or where he is, you know, his whereabouts, in other words. That's what disorientation means to me.

Q. Is that why you were speaking to Mr. Laudenklos?

A. Yes.

Q. Based on the facts that you have just related, do you have an opinion as to whether Earl Laudenklos, on January 22nd, 1974, had any mental ability to transact any type of business?

(Mr. Byrnes) Objection.

(Mr. Ryan) Objection.

(The Court) Sustained.

Q. Did you ask Mr. Laudenklos any questions that day?

A. I believe I did.

Q. Did he answer your questions?

A. *He seemed incoherent.*

Q. How many —

(Mr. Byrnes) Objection.

(The Court) *Strike that from the record. Did he answer you?*

A. Do you mean sensibly?

(The Court) *Mrs. Kruba, just before you testified you do not remember any responses. Now we are trying to establish whether you did get responses or not, and, if so, what sort of responses did you get?*

A. *Well, then, I didn't get any responses from Mr. Laudenklos."* (Emphasis added.)

Obviously, nurse Kruba was not prohibited from describing Mr. Laudenklos as "disoriented;" in fact, as we have already pointed out, her January 21 notation in the hospital record, which was placed into evidence, states that the testator "Appears confused, disoriented. Does not give correct responses related to questions." Additionally, this nurse was permitted to testify as to the decedent's physical condition and to characterize him as "very confused." Since there is little if any difference, in the context in which the words are being used in this case, between being "disoriented" and "confused," and being "incoherent," the caveator's complaint that the nurse was not allowed to describe Mr. Laudenklos as "incoherent" would seem of little significance. We add that, in any event, nurse Kruba seemed to withdraw her statement that the testator "seemed incoherent" when, after the judge narrowed the question, she replied that "Well, then, I didn't get any responses from Mr. Laudenklos."

The final point raised on this appeal relates to the trial

court's alleged refusal to allow the caveators' expert medical witness, Dr. Solomon Snyder, to consider the nurses' para-medical progress notes in formulating his opinion of the decedent's testamentary capacity. For several reasons, we are unable to detect any error committed by the circuit court. The basic answer to the caveators' assertion is that the record does not plainly reflect that they sought to be permitted to have the doctor consider the nurses' notes in arriving at his opinion and were denied permission. The record contains only a few oblique references to a conference in chambers wherein, it is intimated, the trial judge may have indicated that Dr. Snyder would not be allowed to rely on the para-medical notes as a foundation for his opinion. Nowhere in the record is it shown that the caveators attempted to ask the doctor his opinion of the decedent's testamentary capacity based even in part on the nurses' notes; in fact, the question propounded by the caveators excludes such a consideration:

> Q. [(Mrs. Pine)] . . . Based on your extensive studies, and based on your work in the field of pharmacology and psychiatry, and based on the testimony of all of the plaintiff's witnesses, only, assuming the testimony to be true, *and excluding from your opinion nurses' notes, opinions or inferences from the opinions, or the conclusions of others*, and based on a review of the medical records, do you now have an opinion as to the mental capacity of Charles Earl Laudenklos on January 22nd, 1974 to make a valid deed or contract?
>
> A. Yes.
>
> Q. Now, would you give us your opinion?
>
> (Mr. Byrnes) Objection.
>
> (Mr. Ryan) Objection.
>
> (The Court) Overruled.
>
> A. My opinion is that he was not mentally competent to make a valid will." (Emphasis added.)

Because the issue was not plainly raised or decided below, we cannot address it here. Rule 885. However, even assuming the court erroneously prevented Dr. Snyder from relying on the notes, the doctor was permitted to opine that the testator "was not mentally competent to make a valid will," which opinion, formulated independent of those notes, may well have weighed more heavily in the minds of the jurors than would a similar opinion taking them into account. Consequently, even if there was error in this regard, it would appear to have been harmless. Additionally, as we have mentioned before, the nurses' notations were already in evidence and therefore even an improper refusal to allow the doctor to utilize them would seem to be of less magnitude.

Finding no reversible error on those matters properly before us, we shall affirm the rulings of the trial court.

*Rulings of the Circuit Court for Baltimore County affirmed.*
*Appellants to pay the costs.*