741 A.2d 1205

**Mark SHPIGEL et al.**

v.

**Doreen Elizabeth WHITE.**

**No. 47, Sept. Term, 1999.**

Court of Appeals of Maryland.

Dec. 10, 1999.

Peter D. Ward, Baltimore, for Appellants.

Guido Porcarelli, Baltimore, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

RODOWSKY, Judge.

This appeal is taken by plaintiffs from a summary judgment for the defendant in a personal injury action based on a motor vehicle tort. The appeal arises out of an unsuccessful effort to prove causation and damages through medical records and bills without live witness sponsorship or amplification.

The plaintiffs-appellants are Mark Shpigel (Shpigel) and his children, Benjamin and Daniela, who were respectively five and four years of age on May 21, 1996, the date of the subject accident. Shpigel owns and operates a 1991 Chevrolet taxi-cab. The accident occurred at the intersection of Painters Mill and Reisterstown Roads in Baltimore County at approximately 8:45 a.m. while Shpigel was driving Benjamin and Daniela in his cab to daycare. Shpigel was in the merge lane

from Painters Mill Road for traffic seeking to proceed in a southerly direction on Reisterstown Road. Unable to merge, he had come to a full stop when a vehicle operated by the defendant-appellee, Doreen Elizabeth White (White), made contact with the rear of Shpigel's cab. There is no claim for property damage to Shpigel's taxicab in the record before us, and none of the plaintiffs, all of whom were wearing their seatbelts, suffered any impact against any portion of the interior of the cab.

The plaintiffs were transported by ambulance to Northwest Hospital Center in Randallstown where they were examined in the emergency room by a Dr. Matheus. Each plaintiff was discharged that morning, and, on discharge, computer generated discharge instructions were furnished for each plaintiff between 11:20 a.m. and 11:32 a.m. These discharge instructions were signed by a member of the emergency room staff. Shpigel's set of instructions estimated that his complaints would subside in three days. His hospital bill was $146.30, and those of the children were $51.04, each.

On the day immediately following the accident Shpigel presented at the offices of Drs. Braeger, Gaber and Associates, P.A. (the P.A.). Following the initial examination there were four follow-up visits. The P.A. also administered physical therapy on eight occasions between May 24 and July 25, 1996. Records generated by the P.A. which Shpigel sought to introduce consisted of a bill totaling $867, notes of office visits, and three "disability certificates" that collectively state that Shpigel was "totally incapacitated" from May 22 through June 14 and that he had "recovered sufficiently to be able to return to regular work duties on June 17, 1996."

Also on the day immediately following the accident Benjamin and Daniela were examined by a pediatrician, Dr. Allen Stambler, who found nothing wrong with either child. Dr. Stambler billed $450 per child, a figure that includes $75 per child for the preparation of reports to plaintiff's counsel. On May 28, 1996, William D. Petok, Ph.D. conducted a "diagnostic interview exam" of Benjamin and Daniela, followed by four

"family psychotherapy" sessions, the last of which was on August 19, 1996. Dr. Petok billed $475. The record does not contain any written report from him.

The instant action was filed on February 13, 1997, and the summary judgment from which this appeal is taken was entered on November 30, 1998, the day on which trial was scheduled. During discovery the plaintiffs furnished copies of the reports of the P.A. and of Dr. Stambler to White by attaching them to answers to interrogatories. On February 12, 1998, the plaintiffs also furnished copies of all of the bills and reports in issue here in response to the defendant's request for production of documents.

In June 1998 the plaintiffs sought voluntarily to dismiss this action in order to refile in the District Court of Maryland. White opposed that dismissal on the ground that she was entitled to a jury trial, and the circuit court refused leave to dismiss. See Maryland Rule 2–506(b). The trial date of November 30, 1998, was set on June 11, 1998.

On October 21, the plaintiffs served a request for admissions on White to which the medical reports and bills were attached. The plaintiffs sought an admission that the documents were business records and that the amounts charged were fair, reasonable, and necessary. White denied the request for admissions. The plaintiffs also served the following notice on White on October 21:

"Plaintiffs ... hereby give notice of their intent to place in evidence at the trial of this case pursuant to Maryland Rules including, but not limited to, Rules 5–803(b)(3), (4) and (6), copies of the documents designated EXHIBITS A–T appended to the Plaintiffs' Request For Admissions previously served on Defendant's counsel, authenticated by a custodian of records."

Exhibits A through T include all of the medical records, reports, and bills in issue here.

On the morning of trial the court and counsel met in chambers. Although that meeting is unrecorded, it seems to have considered, in effect, a motion *in limine* by White. It is

clear that the discussion focused on the plaintiffs' intent to proceed without producing any live expert medical testimony and on White's objection that the records were not admissible, or if admissible, legally insufficient. At the conclusion of the discussion, proceedings were conducted in open court for the purpose of giving the plaintiffs the opportunity to make by proffer a record for appeal.

Counsel for the plaintiffs explained that the clients could not afford to pay the fees charged by the experts to testify in court. After describing the way in which the accident happened, counsel proffered that Shpigel would testify that, following the impact, he "felt an immediate pain in his neck landing on the right side. The children were also shaken on the impact and were frightened and crying." Shpigel further would testify "that the pain in his neck worsened over the next several hours, he developed headaches, general stiffness and aching, [and] had difficulty sleeping because of the pain." In addition, Shpigel would have testified that he lost income while he continued to carry certain business expenses during the period he was disabled from working. The children were examined by Dr. Stambler, it was proffered, because the instructions from the hospital were that "they should be followed up on by their pediatrician." Dr. Petok was consulted because "the children became extremely fearful about riding in a vehicle. Their parents' efforts to reassure them ha[d] very little effect. They also had sleep disturbances...."

The plaintiffs then tendered the records and bills, with accompanying affidavits by the custodians of those records. The affidavits stated as fact all of the elements required for admissibility of a business record under Maryland Rule 5–803(b)(6).[1] With respect to the bills for services, a lay custodi-

---

1. Maryland Rule 5–803(b)(6) reads:

 "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 ....

 "(b) Other exceptions. ...

 ...."

an for Northwest Hospital Center, a lay custodian for the P.A., and Drs. Stambler and Petok respectively made affidavit that their bills were fair and reasonable and that the services were incurred as a direct result of the automobile accident of May 21, 1996.

White argued, *inter alia,* "that Mr. Shpigel himself has had multiple prior accidents and there is documentation indicating that there are residuals. It's our position that we are entitled to cross-examine those individuals on the fairness, reasonableness of treatment, billing and causal connection."

From a procedural standpoint, the circuit court treated the issue before it as one raised by a motion for summary judgment in favor of the defendant. The court granted the motion, stating that it was "this court's view that in a case such as this, the issue of causation requires an expert opinion." The court then explained why "as a practical matter" the records would not be admitted "in a case such as this," saying:

"The defense alleges that these injuries are not caused by this accident. That the plaintiff's condition is not as a result of the occurrence that happened on May 21st involving Miss White, that it's related to some other occurrence or other occurrences. That the treatment was not reasonable. That the medical expenses the plaintiff incurred were not reasonable. And the defense wants the opportunity to cross-examine and to see if some expert will say that they are reasonable, will say that it's causally connected in court.

"(6) Records of regularly conducted business activity. A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation. A record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness. In this paragraph, 'business' includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

Without such testimony put on by the plaintiff that, in fact, there is a causal connection between the negligence, the breach of the duty and the damages then the jury cannot hear the case."

After referring to Maryland Code (1974, 1998 Repl.Vol.), § 10–104 of the Courts and Judicial Proceedings Article (CJ), dealing principally with the admissibility in the District Court of Maryland of writings or records of health care providers and discussed, *infra,* the court ruled that "the types of records sought to be introduced in this case are not admissible in circuit court."

The plaintiffs appealed to the Court of Special Appeals, and this Court issued the writ of certiorari on its own motion in order to address the fundamental issues presented.

I

We shall first address whether, and to what extent, the plaintiffs were able to overcome a hearsay objection to their attempted introduction of the records as business records under Rule 5–803(b)(6). To lay the authenticity foundation for admission under that hearsay exception, the plaintiffs sought to use Rule 5–902(a)(11) which reads as follows:

"(a) *Generally.* Except as otherwise provided by statute, extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

. . . .

"(11) Certified records of regularly conducted business activity. The original or a duplicate of a record of regularly conducted business activity, within the scope of Rule 5–803(b)(6), which the custodian or another qualified individual certifies (A) was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters, (B) is made and kept in the course of the regularly conducted business activity, and (C) was made and kept by the regularly conducted business activity as a regular practice, unless the sources of information or the method or circum-

stances of preparation indicate lack of trustworthiness; but a record so certified is not self-authenticating under this subsection unless the proponent makes an intention to offer it known to the adverse party and makes it available for inspection sufficiently in advance of its offer in evidence to provide the adverse party with a fair opportunity to challenge it."

■ The notice sent by the plaintiffs on or about October 21, 1998, arguably complied with the requirement of Rule 5–902(a)(11) for notice of intent to offer the documents as self-authenticating records "sufficiently in advance of [their] offer in evidence to provide [White] with a fair opportunity to challenge [them]." The records had been furnished to White in the preceding February in the plaintiffs' response to White's request for the production of documents. In the Rule 5–902(a)(11) certifications the custodians of the proffered records made oath as to the three factual elements, (A), (B), and (C), required by the Rule. The circuit court did not address the adequacy of the notice to invoke Rule 5–902(a)(11), although White argued that the notice was inadequate. The circuit court, in effect, exercised its discretion in not granting summary judgment on that ground, and we do not ordinarily undertake to sustain a summary judgment by ruling on a ground not ruled upon by the circuit court. *See Three Garden Village Ltd. Partnership v. United States Fidelity & Guar. Co.*, 318 Md. 98, 107–08, 567 A.2d 85, 89 (1989).

In rejecting the proffered documents the circuit court in part relied on CJ § 10–104. That statute, *inter alia*, applies to a claim for "[d]amages for personal injury." § 10–104(b)(1)(i). Its application is limited to a proceeding in the District Court of Maryland, or to certain proceedings in a circuit court under circumstances which are not applicable here. § 10–104(b)(2). Under the statute a writing or record of a health care provider, which is otherwise admissible, "is admissible without the support of the testimony of a health care provider as the maker or the custodian of the writing or record to prove the existence of a medical, dental or health

condition, the opinion, and the necessity and the providing of health care." § 10–104(d). Further, under § 10–104(e)

"[a] written statement or bill for health care expenses is admissible without the support of the testimony of a health care provider as the maker or the custodian of the statement or bill to prove the amount, fairness, and reasonableness of the charges for the services or materials provided."

In order to utilize this statute, the proponent of the evidence must give notice to all other parties, at least sixty days before the beginning of the trial of that party's intent "to introduce the writing or record without the support of a health care provider's testimony" and furnish a copy of the writing or record to all other parties. § 10–104(c)(1).

Section 10–104 does not restrict the scope and operation *in a circuit court* of Maryland Rule 5–902(a)(11). Rule 5–902 became effective July 1, 1994, Michie's Annotated Code of Maryland, 1 Md. Rules at 663 (1999), while CJ § 10–104 was enacted by Chapter 554 of the Acts of 1996 and has been amended subsequently. Although the statute is later in time, it would violate a well recognized rule of statutory construction to construe the statute as impliedly repealing the rule when the latter is relied upon to introduce the business records of health care providers in an action initially filed in the circuit court.[2] More important, § 10–104 clearly is intended to liberalize the admissibility of the business records of health care providers far beyond the self-authentication provisions of Rule 5–902. Under the statute, and unlike the rule, no certification of the custodian is required to establish authenticity. Further, but without undertaking exhaustively to describe possible differences, the statute eliminates any requirement that the proponent of the evidence prove the fair-

---

**2.** Originally § 10–104 applied only to District Court cases. *See* Chapter 554 of the Acts of 1996. House Bill 423 of the 1997 General Assembly session would have applied § 10–104 to both circuit court and District Court cases, but the bill was amended in the course of passage to apply only to certain proceedings in circuit court that are not applicable here. *See* Chapter 443 of the Acts of 1997.

ness and reasonableness of the charges for the health care rendered.

Accordingly, to the extent that the circuit court indicated that a statute, such as CJ § 10–104, was needed in order to make any of the proffered records admissible in a circuit court, we disagree.

## II

■ "[E]ven though a particular hospital record is not barred from evidence as hearsay, it may be that some or all of its contents are open to objection on other grounds." *Dietz v. Moore*, 277 Md. 1, 7, 351 A.2d 428, 433 (1976). Consequently, we must examine the classes of records proffered by the plaintiffs from the standpoint of whether the records themselves established admissibility.

### A. Medical Bills

■ The plaintiffs' purpose in offering the medical bills in evidence was to prove special damages. In order for the amount paid or incurred for medical care to be admissible as evidence of special damages, there ordinarily must be evidence that the amounts are fair and reasonable.

■ "Evidence of the amount or payment of medical bills does not establish the reasonable value of the services for which the bills were rendered or justify recovery therefor." *Kujawa v. Baltimore Transit Co.*, 224 Md. 195, 208, 167 A.2d 96, 102 (1961). In *Kujawa* we affirmed a trial court's ruling that the amount of medical bills incurred by a mother and her son could not be established through the testimony of the mother. We indicated, however, that the personal appearance of the billing doctors was not required. The only requirement was that the plaintiffs should " 'have evidence' " that the charges were reasonable. *Id.* (quoting trial court's ruling). *See also Brooks v. Fairman*, 253 Md. 471, 476, 252 A.2d 865, 868 (1969) (absent evidence of the reasonableness of charges for medical services, an error affecting the verdict in that action, case remanded for a new trial); *Metropolitan Auto*

*Sales Corp. v. Koneski,* 252 Md. 145, 154, 249 A.2d 141, 146 (1969) (absent evidence, *inter alia,* of the reasonableness of hospital charges, judgment reduced and, as reduced, affirmed); *In re Gloria T.,* 73 Md.App. 28, 33–34, 532 A.2d 1095, 1097–98 (1987) (medical bills are not admissible to support restitution award in juvenile proceeding without some evidence of reasonableness), *cert. denied,* 311 Md. 718, 537 A.2d 272 (1988); *Thomas v. Owens,* 28 Md.App. 442, 445, 346 A.2d 662, 664 (1975) ("[B]efore a medical bill can be admitted to prove the reasonableness of the amount charged, there must be other evidence that the charge set forth in the bill was reasonable.").

Professor McLain has pointed out that, although authentication as a business record can be accomplished under Rule 5–902(a)(11) without a live witness, "a live witness still will be needed if ... the business record does not establish all the facts needed to be proved, such as that the proved medical bills were 'reasonable and customary.'" L. McLain, *Self-Authentication of Certified Copies of Business Records,* 24 U. Balt. L.Rev. 27, 75 (1994). *See also* P.W. Grimm, *New Rule Covers Authentication of Business Records,* Vol. 10, No. 2, The Maryland Litigator 1, 5 (Dec.1994) ("The mere fact that these records are admitted into evidence without a testimonial sponsor would not establish that the charges for the services reflected in the bills are reasonable and customary, nor that the treatment itself was appropriate.").

Inclusion in the affidavits of certain of the custodians of the records proffered in the instant matter of statements that the charges were reasonable did not make the medical bills admissible. On that aspect of admissibility required by our cases, the fact to be proved is the reasonableness of the bill, but the witness to that fact is not present and subject to cross-examination. Accordingly, the circuit court did not err in excluding from its consideration on summary judgment the medical bills proffered by the plaintiffs.

### B. The Physicians' Records

In the P.A.'s consultation note dictated on May 29, 1996, based on an examination of May 22, the "clinical impres-

sion" as of the date of that examination was that Shpigel "sustained acute musculoligamentous strain injury of the supporting structures of the cervical spine." The "medical history" segment of the initial consultation note advises that Shpigel "was involved in a motor vehicle accident one year ago in which he injured his neck but from which he recovered without sequelae" and that "[h]e had been followed through this office for that injury as well." Shpigel's purpose in proffering the P.A.'s records concerning his examinations, his visits for physical therapy, and the disability certificates is to prove that he was totally disabled from May 22 through June 17, 1996, with resulting economic and non-economic damages.

In order to fall within the Rule 5–803(b)(6) exception to the hearsay rule the evidence must be trustworthy. Further, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury." Rule 5–403. Here, the causal connection between the accident of May 21, 1996, and the damages claimed by Shpigel presents a somewhat complicated medical question on which expert testimony is required in order to support a finding that the accident of May 21, 1996, caused a total disability.

The seminal case in this state is *Wilhelm v. State Traffic Safety Commission*, 230 Md. 91, 185 A.2d 715 (1962). There we held that expert testimony was required in order to establish a causal nexus between a motor vehicle collision and "emotional disturbances in [the plaintiff] sufficient to evoke, subconsciously, grossly exaggerated symptoms." *Id.* at 101, 185 A.2d at 719. Expert testimony was also required to establish a nexus "between the accident and abdominal and back pains associated with the [plaintiff's] menses." *Id.* No expert testimony, however, was required in order to prove the nexus between the accident and a loss of pigmentation on the plaintiff's forehead at the site where her head struck a sun visor in the accident and where she had a bruise for some three or four months. *Id.* at 103, 185 A.2d at 721.

■ Maryland appellate cases on this issue have recently been reviewed for the Court of Special Appeals by Judge Thieme in *Hunt v. Mercy Medical Center,* 121 Md.App. 516, 538–42, 710 A.2d 362, 373–75 (1998), and by Judge Moylan in *S.B. Thomas, Inc. v. Thompson,* 114 Md.App. 357, 376–81, 689 A.2d 1301, 1310–13 (1997). Although recognizing that these cases are fact specific the court in *S.B. Thomas* undertook a distillation, saying:

"A genuine jury issue as to the causal relationship between an earlier injury and a subsequent trauma may sometimes be generated, even in the absence of expert [medical] testimony, when some combination of the following circumstances is present: 1) a very close temporal relationship between the initial injury and the onset of the trauma; 2) the manifestation of the trauma in precisely the same part of the body that received the impact of the initial injury; 3) as in *Schweitzer v. Showell,* [19 Md.App. 537, 313 A.2d 97 (1974),] some medical testimony, albeit falling short of a certain diagnosis; and 4) an obvious cause-and-effect relationship that is within the common knowledge of laymen."

*Id.* at 381–82, 689 A.2d at 1313. In this case there is no "obvious cause-and-effect relationship" between the accident and the claimed total disability "that is within the common knowledge of laymen."

Here, the issue is whether the records of the P.A., in and of themselves, are admissible to supply the necessary medical opinion. The same factors that underlie the holdings on the need for expert medical testimony on causation are also relevant to whether that expert testimony is to be presented through a live witness or through a business record. In this case the records of the P.A. reflect that Shpigel previously suffered a neck injury, and White contests the opinion, expressed in the records of the P.A., that there are no residual symptoms from that prior injury. The instant case also involves issues of the degree of force of the trauma, and there is a conflict between the P.A.'s opinion of a total disability of several weeks duration and the prognosis of three days discomfort made in the hospital discharge instructions.

Although Maryland Rule 5–803(6) is not verbatim Fed. R.Evid. 803(6), the changes in the former from the latter "are intended to be nonsubstantive." L. McLain, *Maryland Rules of Evidence,* at 245 (1994). The editors of 5 *Weinstein's Federal Evidence* § 803.11[7][a], at 803–76 through 803–77 (2d ed.1999), in addressing the type of issue now before us, state that "[i]f the expert is available and the diagnostic opinion is of a kind competent physicians may disagree upon, the judge has discretion to require the expert to testify to insure trustworthiness through cross-examination, particularly if the medical issue is crucial." (Footnote omitted).

In *Owens–Illinois, Inc. v. Armstrong,* 326 Md. 107, 604 A.2d 47, *cert. denied,* 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992), this Court described the factors that could lead to a determination that a business record is untrustworthy. We said:

"The factors that can be utilized by a trial judge in determining whether a business record or a portion of a business record should be excluded for lack of trustworthiness may include such factors as: 1) the purpose for which the record was prepared and any possible motive to falsity including whether the record's use in prospective litigation was a motive for its preparation; 2) how routine or non-routine the record is and how much reliance the business places on the record for business purposes; and 3) where, as in the instant case, the record contains opinions and conclusions—how valid, speculative, or conjectural the opinions or conclusions are, as well as the need for interpretation or cross-examination to prevent misleading or confusing the trier of fact."

*Id.* at 115, 604 A.2d at 50–51 (citations omitted).

Somewhat analogous to the instant matter is *Chadderton v. M.A. Bongivonni, Inc.,* 101 Md.App. 472, 647 A.2d 137 (1994). *Chadderton* was a workers' compensation case in which the insurer and the Subsequent Injury Fund succeeded in placing in evidence in the circuit court copies of the reports rendered to them by the physicians to whom they had referred the

claimant for the purpose of obtaining an opinion on the nature and extent of disability. Closely following the analysis in *Yates v. Bair Transport, Inc.*, 249 F.Supp. 681 (S.D.N.Y.1965), the Court of Special Appeals held that the reports were inadmissible.

*Yates* was a motor vehicle accident case involving a plaintiff who had previously made a workers' compensation claim. The plaintiff sought a pretrial ruling on the admissibility of medical reports rendered by his treating physicians in the then pending accident case and by physicians who had examined him for the insurer in the workers' compensation case and for the insurer of the defendant in the motor vehicle accident case. *Id.* at 689. There was a stipulation that the reports were authenticate, and the court concluded that they were regularly maintained business records. The *Yates* court then addressed the concern noted in *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), "with the likely untrustworthiness of materials prepared specifically by a prospective litigant for courtroom use." *Yates*, 249 F.Supp. at 689. The court in *Yates* looked for "an added element of trustworthiness which will counterbalance the fact that these reports were prepared in clear anticipation of litigation." *Id.* at 689–90. That added element of trustworthiness was found in those reports that were rendered by physicians to whom the plaintiff had been referred by the defendant, and the *Yates* court ruled that it would admit those reports. On the other hand, the court would not admit those reports rendered by the plaintiff's treating physicians, saying: "No case, however, has been found or cited wherein a plaintiff was permitted to introduce self-serving reports made by doctors of his own choosing, in anticipation of litigation to shore up his own case." *Id.* at 691 (footnote omitted).

The Court of Special Appeals in *Chadderton*, applying the *Yates* rationale, held that the reports rendered by physicians to whom the claimant had been referred by the workers' compensation insurer and the Subsequent Injury Fund were not admissible when introduced by the parties who had arranged for those reports, essentially for a lack of trustworthi-

ness. *Chadderton,* 101 Md.App. at 483–84, 647 A.2d at 142. Erroneously admitting the reports was held to be prejudicial, because the plaintiff was unable to cross-examine the physicians whose opinions were introduced in report form. *Id.* at 486, 647 A.2d at 144. Thus, although the circuit court in *Chadderton* had been persuaded that the reports were admissible under a section of the Workers' Compensation Act stating that " 'the proceedings in an appeal shall be informal and summary,' " *id.* at 479, 647 A.2d at 140, and although the circuit court had found the reports to be sufficiently trustworthy, the Court of Special Appeals focused only on the trustworthiness aspect of that ruling. The appellate court in effect held that the circuit court had abused its discretion in concluding that the reports were trustworthy.

Much the same problem was presented in *Kelly v. HCI Heinz Construction Co.,* 282 Ill.App.3d 36, 218 Ill.Dec. 112, 668 N.E.2d 596, *appeal denied,* 169 Ill.2d 569, 221 Ill.Dec. 439, 675 N.E.2d 634 (1996). Kelly, a bricklayer, was injured in the collapse of a scaffold on which he was working. Under the Illinois Structural Work Act he sued the general contractor and the company which had supplied the scaffolding. At trial Kelly unsuccessfully sought to introduce as business records the records of his attending physician and the records prepared by a physician to whom the scaffolding supplier had referred Kelly. The appellate court sustained both exclusions. The treating physician's records were excluded as records prepared in anticipation of litigation and not made in the regular course of business. 668 N.E.2d at 600. The same objection applied to the report by the defense expert, but those records "may nevertheless be admissible against a party as an admission." *Id.*

The Illinois court then summarized a portion of 2 J.W. Strong, *McCormick on Evidence* § 293, at 281 (4th ed.1992). The full text of the cited portion of that commentary, dealing with diagnostic statements in hospital records, is as follows:

> "However, admissibility of all such entries is not assured. First, where there are indications of lack of trustworthiness, which may result from a lack of expert qualifications or

from a lack of factual support, exclusion is warranted under the rule. Moreover inclusion of opinions or diagnoses within the rule only removes the bar of hearsay. In the absence of the availability of the expert for explanation and cross-examination, the court may conclude that the probative value of this evidence is outweighed by the danger that the jury will be misled or confused. This is of particular concern if the opinion involves difficult matters of interpretation and a central dispute in the case, such as causation. Under these circumstances, a court operating under the Federal Rules, like earlier courts, is likely to be reluctant to permit a decision to be made upon the basis of an un-cross-examined opinion and may require that the witness be produced."

*Id.* (footnotes omitted).

The Illinois appellate court held that "[t]he trial court could properly have concluded that the opinions of [the defense expert] were important enough that they should be presented by live testimony, rather than in the form of medical records." *Kelly,* 668 N.E.2d at 600.

In the matter now before us the factors considered by the cases and commentators reviewed above are present. Although the P.A. records were not so clearly prepared for litigation as are medical reports rating a claimant for workers' compensation benefits, nevertheless, the issuance by the P.A. of total disability certificates to Shpigel, who is self-employed, and who was on a personal trip when the accident occurred, suggests that litigation considerations were recognized in conjunction with the medical treatment. Further, the subject matter of the P.A. records are central to the litigation, the opinions contained therein are contested, as indeed is the necessity for the treatment, and the conflict with the prognosis of the emergency room discharge instructions evidences that White's insistence on the opportunity to cross-examine is not without foundation. Consequently, we hold that the circuit court acted within its discretion in ruling that the P.A. records would not be admissible. This discretion is conferred by the trustworthiness requirements of Rules 5–902(a)(11) and 5–

803(b)(6), as well as by the trial judge's discretionary power conferred by Rule 5–403 to exclude evidence if its probative value is outweighed by the danger of misleading the jury.

█ The findings in Dr. Stambler's reports to plaintiffs' counsel, based on his examinations of Benjamin and Daniela, are essentially negative. They report that each child "was obviously frightened, and cried immediately after the accident" and that each child "slept well that evening, experienced no vomiting, but complained of frontal headache." We infer that Dr. Stambler's report was proffered in order to evidence the reasonableness or necessity of Shpigel's engaging a psychologist to examine and treat the children. Viewed from this light, there was no error in excluding Dr. Stambler's reports because there is no report from the psychologist and Dr. Stambler's reports do not recommend any psychological consultation.

## C. The Hospital Records

█ The hospital records of Northwest Hospital Center concerning the emergency room visits of Shpigel, Benjamin, and Daniela immediately following the accident are offered as within the business records exception to the hearsay rule, and for the purposes of this appeal, we treat the proffered records as authenticated, as described in Part I above. This Court has said that "the business records exception to the rule against hearsay, under which hospital records are included, 'properly administered . . . would seem to be among the safest of the hearsay exceptions.'" *State v. Garlick*, 313 Md. 209, 216, 545 A.2d 27, 30 (1988) (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 n. 8, 100 S.Ct. 2531, 2539 n. 8, 65 L.Ed.2d 597, 608 n. 8 (1980)). "[O]nce it is clear that the hospital record was made during 'the regular course of business' and the recorded transactions are 'pathologically germane to treatment' the record is admissible as an exception to the hearsay rule." *Id.* at 223, 545 A.2d at 33. "[W]e have held in numerous cases [that] hospital records are not inadmissible as hearsay in Maryland because they fall within the statutory business record exception." *Dietz*, 277 Md. at 7, 351 A.2d at 432.

 Rule 5–803(b)(6) expressly recognizes that a "diagnosis" may be part of a business record. Further, in appropriate cases, this exception to the hearsay rule may apply where the proponent of the record seeks to use it to prove a causal connection between some trauma and a claimed physical injury. *Lee v. Housing Authority of Baltimore*, 203 Md. 453, 101 A.2d 832 (1954), is illustrative. In that case the plaintiff's decedent died from burns suffered in a fire in the pantry area of her apartment leased by her and her husband from the defendant. The plaintiff sought to introduce as substantive evidence the record from the hospital emergency room which included the statement that the patient had been admitted "following the explosion of a gasoline water heater in a confined area." *Id.* at 459, 101 A.2d at 834 (italics omitted). This Court held that the quoted portion of the hospital record should have been admitted by the trial court. It was pathologically germane. The Court explained:

"In the instant case we think the record of the alleged cause of the burns to be treated was a proper part of the medical history. The entries do not undertake to establish the cause of the explosion, but merely relate to the nature of the substance causing the burns, gas, and the character of the combustion, an explosion. It is certainly customary and proper to record the type of accident causing the injury, and this information may have an important bearing upon the diagnosis, as indicating what the doctors should look for, and upon the treatment to be applied. We think the information recorded, from whatever source obtained, was not outside the regular course of professional inquiry."

*Id.* at 460–61, 101 A.2d at 835.

*Scott v. James Gibbons Co.*, 192 Md. 319, 64 A.2d 117 (1949), involved the use of hospital records by the plaintiff in a fatal automobile accident case. There this Court said:

"Of course such records are admissible, and statements therein showing the history of the patient's physical condition are proper. History in this connection means the physical background as well as the present condition of the patient. It is proper for the record to show the patient was

hurt in an automobile accident, but the particulars of such accident, contained in a hospital record, should be deleted and not submitted to a jury in a case like this. This is hearsay."

*Id.* at 330, 64 A.2d at 122.

In the instant matter the computer generated discharge instructions for each plaintiff begin in part by saying, "Our doctors and staff appreciate your choosing us for your emergency medical care needs." The next section headed, "Motor vehicle accidents," is the same for each plaintiff. In part it reads:

"You have suffered injuries in a car crash. Although you have been injured, hospital care does not appear to be needed right now.... These minor injuries are usually much better after 3 days."

The printouts for the two children next contain "additional instructions" and "follow up care" sections. Benjamin was advised to "follow up with your pediatrician if needed," and Daniela was advised to rest and follow-up with her pediatrician. In another section of their instructions the children respectively were advised to call the pediatrician "as soon as possible."

The discharge instructions for Shpigel contain additional sections headed "Muscle strain," "neck injuries," "heat therapy," "prescriptions," and "Ibuprofen." [3] Under the "neck injuries" section the record states: "Your exam shows you have strained the muscles and ligaments in your neck. This injury is very common in car accidents."

The circuit court found that the particular hospital records proffered in this case were not trustworthy. We hold that, in so finding, the court acted within its discretion. It is apparent from the face of the Northwest Hospital emergency room discharge instructions that they are not traditional hospital records. They are an aggregation of pre-programmed, computer-generated paragraphs—in a word, they are boilerplate.

---

3. Examples of the latter include Advil.

Looking at the admissibility issue from its most fundamental aspect, the hospital may not even have intended that the discharge instructions express an opinion whether there was any bodily injury or any need for emergency room treatment. The sentence, "You have suffered injuries in a car crash," may be simply a "plain language" way of stating the history given by the plaintiff and not a medical diagnosis that there were injuries. Similarly, the sentence, "Our doctors and staff appreciate your choosing us for your emergency medical care needs" may be no more than a discrete way of saying, "Thanks for your business," and not an opinion that emergency room treatment was reasonably necessary.

If we assume that the statement, "[a]lthough you have been injured" is intended to be a diagnosis, it is so general as to be of little help to a jury. The statement that appears only in Shpigel's discharge instructions to the effect that he has suffered a strain of the muscles of the neck, appears to be intended as a diagnosis. The record, however, is unclear as to who made the assumed diagnosis. The discharge instructions are not signed by the physician who is identified as having examined the plaintiffs. The person who does sign the discharge instructions does so above a line marked "Staff Signature," but the qualifications of that person are unknown. Also unknown is whether the examining physician specifies which boilerplate paragraphs are to be printed or whether the staff person decides which paragraphs are appropriate, based on information received. Records of a regularly conducted business activity "may be excluded if the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness." Rule 5–803(b)(6).

Further, without live testimony in the instant matter, the jury would be left ignorant of how restricted the physician might be, within the computer program's menu of boilerplate paragraphs, in matching the actual findings to the available print outs. For example, could the physician have printed out specific objective findings of the examination, if that were the case, or have printed out that the diagnosis was based entirely on subjective complaints, if that were the case?

In this litigation the visits to the emergency room are the first steps in Shpigel's claim of total disability and in the claim on behalf of the children for psychological harm. Those claims are vigorously contested, and the circuit court permissibly could conclude that medical evidence offered to support the first steps should be subject to cross-examination. Thus, although in many cases emergency room records, when authenticated and pathologically germane, may be readily admitted pursuant to Rule 5–803(b)(6), under the facts of this case the circuit court did not abuse its discretion in ruling that the discharge instructions were not admissible.[4]

### III

For all of the reasons stated above, the judgment of the Circuit Court for Baltimore County is affirmed.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY MARK SHPIGEL, ONE OF THE APPELLANTS.*

---

4. This case was argued in this Court as if the proffered documents were the sole source of admissible evidence in support of the plaintiffs' claims. The plaintiffs did not argue in the circuit court or here that this case was the type in which medical testimony was not required to prove some harm and an entitlement to some damages. See *Wilhelm v. State Traffic Safety Comm'n*, 230 Md. 91, 185 A.2d 715 (1962).