24 A.3d 692

**Waymon ANDERSON**

v.

**STATE of Maryland.**

**No. 92, Sept. Term, 2010.**

Court of Appeals of Maryland.

July 13, 2011.

Stacy McCormack, Asst. Public Defender (Paul B. DeWolfe, Public Defender, and Sherrie B. Glasser, Asst. Public Defender, Baltimore, MD), on brief, for petitioner.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

In the Circuit Court for Montgomery County, a jury convicted Waymon Anderson, Petitioner, of sexual abuse of a minor and second degree sexual offense. The State's evidence, which included the testimony of the alleged victim (Petitioner's niece, Brittany B, "Brittany"), was sufficient to establish that he committed those offenses during the first four months of 2008. That evidence, however, included a written report made to Detective Mike Carin of the Montgomery County Police Department by Stephen C. Boos, M.D., who did not testify at trial. The Circuit Court overruled Petitioner's objection to the introduction of that report. After that

ruling was affirmed by the Court of Special Appeals in an unreported opinion, Petitioner filed a petition for writ of certiorari with this Court, in which he presented a single question:

Did the trial court err in admitting the report prepared by Dr. Stephen Boos, who was not present at trial, and in allowing Dr. Evelyn Shukat to testify as to it contents, when such report had not been made for purposes of medical diagnosis or treatment?

We granted the petition. 416 Md. 272, 6 A.3d 904 (2010). For the reasons that follow, we hold that Dr. Boos' report to Detective Carin should have been excluded on the ground that it was prepared in anticipation of litigation, and was not admissible under either the "business records" exception or the "statements in contemplation of treatment" exception to the rule against hearsay. We also hold that the erroneous decision to admit the report into evidence was not harmless beyond a reasonable doubt.

## Background

On April 28, 2008, Brittany told her mother that she had been abused by Petitioner, and her mother took Brittany to Holy Cross Hospital. The records of that hospital, which are admissible under Md. Rule 5–803(b)(6), show that the "follow up instructions" that were given to Brittany include: "Shady Grove Hospital as directed by police for your forensic exam and interview." The investigating officers, however, referred Brittany to The Tree House Child Assessment Center of Montgomery County (Tree House).

On April 28, 2008, Dr. Boos was the Medical Director of the Tree House. The State's case-in-chief included (1) a "redacted" version of Dr. Boos' report to Detective Carin, and (2) expert testimony based on that report, presented by Dr. Elizabeth Shukat, who was the Tree House's Medical Director at the time of Petitioner's trial. The first page of the report was prepared on paper with the following letterhead:

*The Tree House*
Montgomery County Child Assessment Center
7300 Calhoun Pl, Suite 604
Rockville, MD 20855
(Telephone & Fax numbers appear on original)

The report included the following assertions:

Monday, April 28, 2008

To: Detective Mike Carin

 Thomas Earl

From: Stephen C. Boos, M.D.

Re: Brittany B[ ]

 Date of birth: July 24, 1998

 Date of evaluation: April 28, 2008

 Brittany B[ ] is a nine-year-old African–American female who was referred to the Tree House Child Assessment Center of Montgomery County. She presented here on April 28, 2008, accompanied by her mother, Doris B[ ]. She was referred for a medical history recommendation[ ] pursuant concerns of child sexual abuse.

**Past medical history:**

\* \* \*

On a review of systems the child reported stomachaches since last week. She feels this as a very brief rumbling pain in her supra umbilical area in the afternoon. As noted, the pain is brief and it occurs less than every day. For genital symptoms, Brittany reported burning urination sometimes. She spontaneously commented "it started when Uncle [ ] do that." I asked her how long it lasts after [ ] "do that," and she said for a few days. She has no history of constipation, no history of past genital injury, and no medical attention for genital or anal complaints.

**History from Brittany B[ ]**

 I spoke with Brittany about the things she likes to do in her school environment to become more familiar with her. I reminded her that I was a doctor and we needed to talk about doctor things. I told her that doctors have two

problems when they talk to patients. First, sometimes kids want to give an answer when an adult asks a question, and they may not know the answer or not understand the question. I told her that I needed her to tell me if she didn't understand the question and ask me to rephrase it. I also told her that if she didn't know the answer she should tell me that rather than guessing, because that would not help me take care of her. I then continued that doctors talked about very private things and sometimes kids want to keep a secret. I encouraged her either to tell me the truth, or if she just could not reveal something, to tell me that it was secret, but never to lie to me because if I made a decision based on the lie, I might not take proper care of her. I then asked her to agree to not lie, not guess and not keep secrets. She agreed to these things.

I then asked Brittany if she knew why she needed to see a doctor today. She replied, "no, not really." I then asked her if anything different happened to her than happens to other kids so that she might need some special doctor's care. She nodded, indicating yes. I asked her to tell me about it. She responded "I was sexually assaulted." I told her that I needed to know exactly how that happened. She replied "my grandma and my mother and my aunt go out, and [ ] tell me to come in his room, and [ ] make me suck his private part." [ ] I told her that she also referred to "he" or "his" and I needed to know who "he" or "his" was. She answered "Uncle Wayne." [ ]

[ ] I asked her if something [ ] ever happened to her body. She answered "my Uncle Wayne licked my private part." I pointed out that previously she had said that she had to suck "his" private part. I wanted to know what private part she was referred to. She responded "[ ] Uncle Wayne." When I asked her if it was every somebody else, she replied "no." I asked her if any other things happened to her body that she didn't like or thought were bad and she replied "no." I asked if there was any other kind of touching that she didn't like, and she again asserted "no." I pointed out that before she had said that it burned her to pee after what

happened to her. She immediately responded "when I use the bathroom, [ ]. I asked her what made it so that it hurt when she peed. She replied "because it's in my area." I pointed out that I didn't understand this, and she explained "because when he licked my private part, he pressed down too hard." I asked her if any other private parts touched on her private part, and she replied "no. I then asked her how about things happening with hands. She answered "no," so I asked her "there wasn't any rubbing or touching" and she correct herself, just answering "rubbing." I then asked her, tell me about rubbing. She answered "he would take his hand or his finger and stick it down my pants." I asked her what he did there and she replied "he would rub, on me, my private area." I asked her who she was referring to this time, and she said "Uncle Wayne." She also told that this made it burn when she urinated.

I returned to the question about sucking on private parts. [ ] I[ ] asked her about Uncle Wayne, and if anything from him got on her. She shook her head no. I added or in your mouth, and she nodded her head, indicating yes. I reaffirmed "so you had to suck his private too," and she reasserted this, saying yes.

I next asked Brittany if she thought about things like this sometimes. She said that she did and it "pops in my mind," when we're talking about stuff. She added "sometimes I think I should tell my mom, sometimes I think she won't believe me." I asked Brittany if her Uncle Wayne [ ] wanted her to tell, and she stated "no." I asked her how she knew this, and she replied "they would say if I told bad things would happen to me." I asked her if [ ] said this, and she said ["]Uncle Wayne.["]

I next asked Brittany why she told her mom's friend. She answered "I needed someone to talk to; I wanted to share my feelings." I asked her to tell me more about that and she said "I felt that I should talk to somebody before I told my mom." When I asked her why, she said "so I could get my story straight, so she would understand it." Because of this utterance I asked her whether or not the

things she had been saying were all true. She asserted that they were, saying "yes." I asked her if anything was exaggerated beyond what had really happened, and she shook her head and said "no." I then asked her how she felt now that she had told. She replied "healthy, good." And she smiled.

\* \* \*

I asked Brittany if she is having any problems with her body now. She denied that she was. She said that sometimes it hurts in her private, like a little pinch every once in a while. She denied any discharge or any bleeding. She also said it no longer hurt to void.

The following transpired when Petitioner's trial counsel moved *in limine* that the State be prohibited from introducing Dr. Boos' report into evidence:

[PETITIONER'S COUNSEL]: The State wants to offer this document from—that's been generated by the Tree House and signed by Dr. Boos—

THE COURT: Okay.

[PETITIONER'S COUNSEL]:—in this matter. It's obviously a hearsay document. I believe that the State is going to rely upon this being under the exception for medical treatment purposes. I am suggesting to the Court, most respectfully, that it does not fit within that rubric. Prior to going—being taken by the police—

\* \* \*

[PETITIONER'S COUNSEL]: Okay. I don't think that this is a statement made by Brittany for the purposed [sic] of treatment to Dr. Boos. One of the reasons that I would suggest to the Court that this wasn't for the purposes of treatment is, the fact that she was already taken to Holy Cross. When she gets to Holy Cross, she's examined by them. The report says what they do. Gives her directions as to what to do in terms of followup. When she gets—if you look at the report to Dr. Boos, the original report, not the redacted version, when Brittany gets—well, **first of all,**

look at to whom the report is directed. It's directed to Detective Mike Carin and Thomas Earl from Dr. Boos.

THE COURT: Okay.

[PETITIONER'S COUNSEL]: That has—he would be doing that there—if you look at [State v.] Coates [, 405 Md. 131, 950 A.2d 114 (2008) ] and you do the analysis that Coates follows in this case, questions concerning the identify of the perpetrator—

THE COURT: They've redacted those.

[PETITIONER'S COUNSEL]:—are not relevant in this case.

THE COURT: Well, actually, I think Coates says that they normally aren't. They may or may not be, and I think that it referred to an earlier case where as if—where the child is still symptomatic, possibly identity might be pathologically germane, but they redacted the references as to the name, so it's a non-issue.

[PETITIONER'S COUNSEL]: And, I guess the other thing that I would point out to the Court is, Dr. Boos, who took the history in this particular case, is the one who reported this information. I have no right to cross-examine. **I can't cross-examine the report, and obviously one of the protections that my client has is to cross-examine Dr. Boos. He's available. He's in Boston. They could have brought him down, rather than trying to put this report in, yet they didn't. My client has a right to confront his accusers, and what's in this report essentially is being used as an accusation. These are statements taken, part of a forensic review—**

\*　　\*　　\*

THE COURT: So that, you know, I'm not inclined, since you have the other witness who is here, subject to cross-examination, to admit the assessment portion of the report. I mean, it would appear to me that the history portion and what the child reports, and we've had the mother here and, I think, [Petitioner's counsel] even asked the mother what she told the doctor, so as to the history portion of the exam,

[Petitioner's counsel], quite frankly, it would appear to me that that does fall within the hearsay exceptions, statements made for purposes of diagnoses or treatment, and I think it was *Coates* and or other cases, but I believe it's *Coates* that says you can clearly have dual purposes, and although she initially says, you know, "I'm not sure why I'm here," the doctor explains what he needs to do and why he needs to do it, and the proffer is it's done that same day as the initial report, which may be within a week. It's a little unclear of the last assault, so, I mean, it clearly seems to me that it does related to diagnosis and treatment. So I'm inclined, frankly, to admit the history portion of what she relates occurred, but not the doctor's assessment. Although I mean, that's the physical exam. I don't have a problem necessarily with the physical exam.

[PETITIONER'S COUNSEL]: Are you talking about where [it] says "past medical history"? Is that the part that you're saying you are willing to admit?

 \* \* \*

THE COURT: I'm talking about "past medical history, social history, history from Brittany B." I'm talking about the first four pages. It's all part of the history as far as I'm concerned.

 \* \* \*

[PETITIONER'S COUNSEL]: You just mentioned that there can be dual purposes.

THE COURT: Right.

[PETITIONER'S COUNSEL]: and one of the things, I think, that comes out in *Coates,* when you read *Coates* carefully, and I'm sure you've [read] it—

THE COURT: Yes.

[PETITIONER'S COUNSEL]:—as closely as I have, is we have to look at the primary purpose, and one of the words that *Coates* uses, I think, quite clearly is the over arching purpose of the interview. Is it for medical? Is it for forensic purposes? Is it, you know—which one of them prevails, or is both? And in this particular case, she's

already had a medical evaluation before she ever got to Dr. Boos, and if this was for medical purposes, I don't see one thing in Dr. Boos' report where there's any suggestion as to what she should do for treatment of this problem, and—

THE COURT: Well, he refers her—I mean, at the bottom—I mean, he orders certain testing. He also says that she should have evaluation, I believe, for—I mean, as I see it, frankly, it seems to me that he is probably—appears to be more focused on the mental health aspects, at least towards the end, than the concerns about the physical, although he orders certain tests to rule out a sexually transmitted diseases and or issues about AIDS, I guess, because of the exposure to semen, but he specifically says, he's cultured her for chlamydia, gonorrhea, he sends her for blood tests for HIV, hepatitis, syphilis, cultured the anus and the vagina. Says if these tests are negative, then she has no specific traditional medical needs stemming from her child abuse, so he clearly is investigating that. He doesn't know yet.

And then I think he goes on to say she's not currently reporting, but he says a medical health assessment is mandatory in this case.

\*　　\*　　\*

[PETITIONER'S COUNSEL]: Well, I don't want the assessment in if I have to accept anything, and the other part is, it's—we've had testimony about all of this already. We've had [Brittany's mother]. I mean, this is certainly cumulative, but—that's my objection.

THE COURT: Overruled, I think, I mean, first of, I think *Coates* makes clear that the real test if what the declarant thinks why they were there.

[PETITIONER'S COUNSEL]: Well yes. What's the state of mid [sic] of the declarant?

THE COURT: But I think as you read through that, he explains to the declarant the need to find this information out, the purposes of it, and it does appear, for reviewing the entire report, that he is addressing potentially for two

purposes, but very much so, one of the purposes at least, is assessing what treatment, whether it is traditional physical, as her [sic] refers to, and or mental health treatment that she may need. I believe that was communicated to her throughout the, I mean, based on the body of the report, and it occurs the same day that she reports it.

(Emphasis supplied).

The State's case included Brittany's testimony. During her testimony, however, Brittany was not questioned about her understanding of why she had been "referred" to the Tree House.

## Discussion

■ Maryland Rule 5–801(c) defines "hearsay" evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." During Brittany's testimony, she was not asked if she understood why she had been (in the words of Dr. Boos' report) "referred for a medical history recommendation" at the Tree House, which (in the words of the State's brief) "provides . . . victim advocacy [and] forensic interviews." The Circuit Court nonetheless found that, when Brittany was answering Dr. Boos' questions, she understood that she was providing information for the purpose of medical treatment or diagnosis.

■ As the above quoted proceedings show, the Circuit Court's finding that Brittany's statements to Dr. Boos were "in contemplation of treatment" was based solely upon Dr. Boos' report to Detective Carin. The report, which was "hearsay" evidence of Brittany's state of mind when she was interviewed by Dr. Boos, should have been excluded pursuant to Md. Rule 5–802. The report was not admissible to establish that Brittany's statements to Dr. Boos qualified under Md. Rule 5–803(b)(4) as statements made for purposes of medical treatment or medical diagnosis in contemplation of

treatment.[1]

Nowhere in the record is there a valid explanation for why the "hospital records" hearsay exception should extend to the report at issue. It is doubtful that, even if Dr. Boos testified, he could have provided such an explanation. Unfortunately, although both Maryland and Massachusetts have adopted the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings,[2] the State made no attempt to use the provisions of the Act to secure the attendance of Dr. Boos. Under these circumstances, the Circuit Court erred in overruling Petitioner's objection to the introduction of the report at issue.

Moreover, even if Dr. Boos had testified as a State's witness, his report to Detective Carin would have been inadmissible unless Petitioner's trial counsel somehow "opened the door" to its introduction. Although the State could certainly have used the report to refresh Dr. Boos' recollection, under Md. Rule 5–612, portions of a writing used to refresh a witness's memory are only admissible "for the limited purpose of impeaching the witness as to whether the item in fact refreshes the witness's recollection." If the report qualified as "past recollection recorded," under Md. Rule 5–802.1(e), the report could "not itself be received as an exhibit unless offered by an adverse party."

██ A witness's prior consistent statement may be admitted (1) under Md. Rule 5–802.1(b), "to rebut an express or

---

1. Although Petitioner's trial counsel also objected to the introduction of Dr. Boos' report on the ground that Petitioner "has a [Sixth Amendment] right to confront his accusers," we shall not address the federal constitutional issue because of our adherence to the well established "principle that we will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground." *Myer v. State,* 403 Md. 463, 475, 943 A.2d 615, 622 (2008). The introduction of Dr. Boos' report "violated Maryland evidence law separate and apart from any rights Petitioner may have under the Sixth Amendment to the United States Constitution." *Id.*

2. Md.Code (2006 Rep. Vol.), Courts & Judicial Proceedings art., § 9–301 *et seq.;* Mass. Ann. Laws Ch. 233, §§ 13A–D (Lexis Nexis 2011).

implied charge against the [witness] of fabrication, or improper influence or motive;" and/or (2) under Md. Rule 5–616(c)(2), if the statement "having been made detracts from the impeachment[.]" These rules, however, become applicable only if "the defendant's opening statement and/or *cross-examination* of a State's witness has 'opened the door' to evidence that is relevant (and *now* admissible) for the purpose of . . . rehabilitation[.]" *Johnson v. State*, 408 Md. 204, 226, 969 A.2d 262, 275 (2009). (Emphasis in original).

In *United States Fidelity & Guaranty Co. v. Continental Baking Co.*, 172 Md. 24, 190 A. 768 (1937), after a plaintiff's witness was cross-examined about a written statement that he had given to a "representative" of the plaintiff, the plaintiff offered that statement into evidence. While affirming the ruling that the cross-examination had "opened the door" to the introduction of the statement, this Court stated:

> [T]he only purpose it could serve the plaintiff, except for its effect on the jury, was to set the witness fairly before the jury and tend to relieve him of the imputation that he was not telling the truth, as might be implied from the questions put to him on cross-examination. **It was only the demand of the defendant that entitled the plaintiff to offer the statement in evidence. . . . The plaintiff could not have offered it at all, had it not been brought into the case by the defendant's demand.**

*Id.* at 32, 190 A. at 771–72. (Emphasis supplied).

In *Shpigel v. White*, 357 Md. 117, 741 A.2d 1205 (1999), this Court held that, "although in many cases emergency room records, when authenticated and pathologically germane, may be readily admitted pursuant to Rule 5–803(b)(6), under the facts of this case the circuit court did not abuse its discretion in ruling that the discharge instructions [given by an examining physician to a plaintiff/appellant] were not admissible." *Id.* at 140, 741 A.2d at 1217. Our opinion in *Shpigel* included the following analysis:

> Somewhat analogous to the instant matter is *Chadderton v. M.A. Bongivonni, Inc.*, 101 Md.App. 472, 647 A.2d 137

(1994). *Chadderton* was a workers' compensation case in which the insurer and the Subsequent Injury Fund succeeded in placing in evidence in the circuit court copies of the reports rendered to them by the physicians to whom they had referred the claimant for the purpose of obtaining an opinion on the nature and extent of disability. Closely following the analysis in *Yates v. Bair Transport, Inc.,* 249 F.Supp. 681 (S.D.N.Y.1965), the Court of Special Appeals held that the reports were inadmissible.

\* \* \*

The Court of Special Appeals in *Chadderton,* applying the *Yates* rationale, held that the reports rendered by physicians to whom the claimant had been referred by the workers' compensation insurer and the Subsequent Injury Fund were not admissible when introduced by the parties who had arranged for those reports, essentially for a lack of trustworthiness. *Chadderton,* 101 Md.App. at 483–84, 647 A.2d at 142. Erroneously admitting the reports was held to be prejudicial, because the plaintiff was unable to cross-examine the physicians whose opinions were introduced in report form. *Id.* at 486, 647 A.2d at 144. Thus, although the circuit court in *Chadderton* had been persuaded that the reports were admissible under a section of the Workers' Compensation Act stating that " 'the proceedings in an appeal shall be informal and summary,' " *id.* at 479, 647 A.2d at 140, and although the circuit court had found the reports to be sufficiently trustworthy, the Court of Special Appeals focused only on the trustworthiness aspect of that ruling. The appellate court in effect held that the circuit court had abused its discretion in concluding that the reports were trustworthy.

*Id.* at 132–134, 741 A.2d at 1213–14 (1999).

Our opinion in *Shpigel* also cited with approval the case of *Kelly v. HCI Heinz Construction Co.,* 282 Ill.App.3d 36, 218 Ill.Dec. 112, 668 N.E.2d 596 (1996), *appeal denied,* 169 Ill.2d 569, 221 Ill.Dec. 439, 675 N.E.2d 634 (1996), in which the Court of Appeals of Illinois affirmed the trial court's ruling

excluding the records of a treating physician that had been prepared in anticipation of litigation. 218 Ill.Dec. 112, 668 N.E.2d at 600.

 In the case at bar, in which the investigating officers referred Brittany to Dr. Boos, Dr. Boos' report to Detective Carin was inadmissible hearsay when offered to establish Brittany's state of mind at the time of her interview. We are therefore required to order a new trial unless we are "persuaded beyond a reasonable doubt that [the inadmissible evidence admitted over Petitioner's objection] did not contribute to the guilty verdict[s] returned against [him]." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

██ Whether the erroneous evidentiary ruling in the case at bar is "harmless beyond a reasonable doubt" can be determined by examining the use that the State made of Dr. Boos' report. The record shows that Dr. Shukat's testimony was based entirely upon that report.[3] The record also shows that the prosecutor's summation included the following arguments:

How else do we know that Brittany is telling the truth in this case? We heard expert testimony from Dr. Shukat. She said that she had conducted exams on thousands of children and what she told you, ladies and gentlemen, is that in a case involving abuse that occurred where the abuse is oral sex, that we wouldn't expect to find physical findings. She did tell you, however, that the painful urination that Brittany said she was experiencing in the days after the abuse, that that is consistent with somebody performing oral sex upon her. She talked to you about these and why a child would not be able to conclusively say a specific date when abuse occurred, and she told you that this was common in her field, that often times children delay in disclosure because, number one, it's a painful memory and they're trying to suppress it, but also because they have had an

---

**3.** The State had the opportunity to—but did not—ask Dr. Shukat to base her opinions on Brittany's testimony, or on Brittany's (admissible) out-of-court statement to a licensed social worker.

express or implied threat. In this case, we know there was an express threat. He told her that if she told somebody, something bad was going to happen.

When asked about whether or not the detail that Ms. Brittany B[ ] provided, whether or not that was consistent with a child who had been exposed to pornography, Dr. Shukat told us that it was. She told us that the detail that Brittany B[ ] provided went beyond her developmental age. A child who had been exposed to pornography would not have the detailed accounts that the victim gave about how ejaculation occurred, more importantly, what the consistency of semen is. You'll recall that Brittany B[ ] described the semen's consistency as being gooey.

Dr. Shukat also told you that a victim of child abuse who had been exposed to pornography would not know that genital pain resulted from those sexual acts, and the fact that Brittany disclosed that she suffered genital pain, that that was not consistent with her watching pornography.

The examination that was given at the Tree House by Dr. Boos also corroborates the abuse that occurred. You're going to be able to look at that document and you're going to be able to look at the statements that Ms. Brittany B[ ] gave. And she stated when he, the defendant, "licked my private part, he pressed down too hard," and after he pressed down too hard, it burned for her to urinate. She also corroborated what she told you on the stand, which is that, "When my grandmother, and my mother, and my aunt go out, Uncle Wayne tells me to come to his room and makes me suck his private part."

She also corroborated the disclosure about the cunnilingus. She said, "Uncle Wayne licked my private part," and she also corroborated that the defendant had threatened her. The defendant told her he didn't want her to tell anyone and if she did, bad things were going to happen to her.

Under these circumstances, we are unable to declare that the erroneous reception of Dr. Boos' report was harmless

beyond a reasonable doubt. Petitioner is therefore entitled to a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS THAT THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY BE VACATED, AND THE CASE BE REMANDED FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.**

HARRELL and ADKINS, JJ., Dissent.

ADKINS, J., dissenting, in which HARRELL, J., joins.

Most respectfully, I dissent from the majority opinion because it seems to superimpose an additional requirement on the Maryland Rule 5–803(b)(4) hearsay exception, i.e., that there be an explicit statement from the child that she understood why she was referred to the health care provider. Although I do not dispute that the pertinent inquiry in deciding whether to admit such evidence is whether the patient believed that the health care provider was going to diagnose or treat her, I think that the trial judge may make such determination based on the circumstances of the medical examination, without an explicit statement from the patient. *See United States v. Edward J.*, 224 F.3d 1216, 1220 n. 3 (10th Cir.2000) (evidence other than the express testimony of the victims sufficiently indicated that they understood the evaluation was for medical purposes, specifically, the victims' ages (eight and ten), the frequency with which the victims had been to that medical clinic before, and the level of maturity demonstrated by their request for a female physician); *United States v. Pacheco*, 154 F.3d 1236 (10th Cir.1998) (evidence that physician explained to victim why she was being evaluated and the process for such evaluation, including showing the child the medical instruments, was sufficient to admit the victim's statements even though the victim did not expressly testify that she knew the procedure was for medical purposes). Although the State has the burden to establish that the

medical examination exception applies, that burden can be satisfied from the content of the medical report itself.

In this case, the child victim was taken to the "Tree House Child Assessment Center For Montgomery County" after her release from Holy Cross Hospital on April 28, 2008, the same day she reported the sexual abuse to the police. Dr. Boos "reminded her that [he] was a doctor and we needed to talk about doctor things," and that she should "never lie to [him] because if [he] made a decision based on the lie, [he] might not take proper care of her[.]" This case contrasts with the circumstances in *State v. Coates,* 405 Md. 131, 143–45, 950 A.2d 114, 122–23 (2008), where the child's question—"are you going to go out and find him now?"—indicated that she thought the examination was part of an investigation rather than an assessment for medical purposes. In that case we agreed with the Court of Special Appeals that the trial court had erred in admitting the hearsay statement.[1] In my opinion, the advisements given by Dr. Boos to the child, the occurrence of the examination on the same day that she visited the hospital, and other circumstances evident to the trial judge, were sufficient to justify the judge's conclusion that the hearsay statements fell within the medical examination exception, and thus its admission did not constitute an abuse of discretion.

Judge HARRELL authorizes me to state that he joins in this dissenting opinion.

----

1. *Coates* instructed that a statement made by a child sexual assault victim to a physician or other health care provider in connection with medical examination or treatment, which has some value for that purpose, is admissible under this exception even though the health care provider had the dual motive of diagnosis/treatment and utilizing the examination for forensic purposes in connection with the assault. *See State v. Coates,* 405 Md. 131, 143–45, 950 A.2d 114, 122–23 (2008). The Court in *Coates* emphasized that "a declarant's statements about the cause of an injury or identity of a culprit must be related to diagnosis or treatment to be admissible." *Id.* at 146, 123–24. It cautioned, moreover, that the exception "does not apply to cases in which a non-treating physician is merely preparing to testify on the patient's behalf." *Id.* at 142, 950 A.2d at 121.